## BROWN CHEMICAL COMPANY *v.* MEYER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE EASTERN DISTRICT OF MISSOURI.

No. 226.   Argued March 18, 1891. — Decided April 6, 1891.

Words which are merely descriptive of the character, qualities or composition of an article, or of the place where it is manufactured or produced, cannot be monopolized as a trade mark.

An ordinary surname cannot be appropriated as a trade mark by any one person as against others of the same name, who are using it for a legitimate purpose; although cases are not wanting of injunctions issued to restrain the use even of one's own name, where a fraud upon another is manifestly intended, or where he has assigned or parted with his right to use it.

The owner of a trade mark, bearing his own name, which is affixed to articles manufactured at a particular establishment, may, in selling the latter, confer upon the purchaser exclusive authority to use the trade mark.

THIS was a suit in equity instituted by the Brown Chemical Company, a corporation organized under the laws of Maryland, against the firm of Meyer Brothers and Co., of St. Louis, in the State of Missouri, to restrain an unfair competition in trade. The bill averred, in substance, that plaintiff had been engaged in the preparation of a certain medicine, which had acquired a high reputation as a remedy for the prevention and cure of many diseases; that in 1879 it devised and used a certain label, consisting of four sides or panels, the front one of which bore the representation of a lion's head, above which was printed the word "Brown's;" in the mouth of the lion was suspended a rod or bar, having dependent therefrom a banner or streamer, bearing the words "Iron Bitters," printed in large, conspicuous letters, and separated by a circular design occupying the central field of the banner. The three remaining panels had also printed thereon the words "Brown's Iron Bitters," in various places, and arranged as shown in the label; that since plaintiff acquired its right in the premises the defendants fraudulently offered and sold medicine put up in bottles, to which labels were attached, containing the words "Brown's Iron

Tonic," which were intended to indicate that the medicine contained in said bottles was that prepared by the plaintiff, which said preparation the defendants had fraudulently caused to be offered and sold as and for plaintiff's preparation; and that large quantities of "Brown's Iron Tonic" had been sold as and for plaintiff's "Brown's Iron Bitters," and frequently mistaken therefor.

The answer admitted most of the allegations of the bill so far as they related to the preparation and sale of Brown's Iron Bitters, denied any fraudulent intent with respect to defendants' own label, and averred that in the summer of 1881 one E. L. Brown, in connection with one C. J. Lincoln, commenced putting up and selling Brown's Iron Tonic at Little Rock, Arkansas, as a wholly distinct preparation from Brown's Iron Bitters, and with no intention or purpose of imitating plaintiff's preparation, which at that time had not been advertised or sold to any great extent; that subsequently Brown sold out his interest in said preparation to Lincoln, who has since that time been putting up said medicine and offering it to the public in cartons and bottles wholly different in size, color and appearance from plaintiff's bottles, and with labels attached to the bottles wholly different in size, color, appearance and details from plaintiff's labels, and enclosed in wrappers very different from the cartons of Brown's Iron Bitters, so that the public could not be misled or the plaintiff injured.

The case as made by the respective parties did not differ materially from their pleadings.

In explanation of the manner in which defendants' preparation originated, Brown swore that from August, 1869, to May 1, 1881, he was travelling salesman for a Louisville wholesale drug house, and during that time travelled extensively in the Southwest, and became generally known to the trade. In May, 1881, he formed a partnership with C. J. Lincoln, of Little Rock, which was dissolved in December, 1883. The firm name was part of the time C. J. Lincoln, and part of the time Lincoln & Brown. Brown did not personally go to Little Rock until December, 1881, when, following out a preconceived notion, he instructed the chemist of the firm to prepare a for-

mula, and they devised a label and began to advertise the preparation through the newspapers and travelling salesmen. They sold some at retail in 1881, of which no record was kept. In the spring of 1882 they began to make sales to the trade. It does not appear that they knew of Brown's Iron Bitters, or that they had seen it until after they had determined upon their own remedy and its label. The opinion of the Circuit Court dismissing the bill is reported in 31 Fed. Rep. 453.

*Mr. Rowland Cox* for appellant.

*Mr. J. E. McKeighan* for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

The general proposition is well established that words which are merely descriptive of the character, qualities or composition of an article, or of the place where it is manufactured or produced, cannot be monopolized as a trade mark; *Canal Company* v. *Clark*, 13 Wall. 311; *Manufacturing Company* v. *Trainer*, 101 U. S. 51; *Caswell* v. *Davis*, 35 N. Y. 281; *Thomson* v. *Winchester*, 19 Pick. 214; *Raggett* v. *Findlater*, L. R. 17 Eq. 29; and we think the words "Iron Bitters" are so far indicative of the ingredients, characteristics and purposes of the plaintiff's preparation as to fall within the scope of these decisions. It is hardly necessary to say that an ordinary surname cannot be appropriated as a trade mark by any one person as against others of the same name, who are using it for a legitimate purpose; although cases are not wanting of injunctions issued to restrain the use even of one's own name where a fraud upon another is manifestly intended, or where he has assigned or parted with his right to use it. *McLean* v. *Fleming*, 96 U. S. 245; *Goodyear Company* v. *Goodyear Rubber Company*, 128 U. S. 598; *Russian Cement Co.* v. *LePage*, 147 Mass. 206; *Hoxie* v. *Chaney*, 143 Mass. 592. The distinction between the lawful and the unlawful use of one's own name is illustrated in the case of *Croft* v. *Day*, 7 Beavan, 84, in which the successor of Day and Martin, originators of the

famous blacking, filed a bill to enjoin the defendant Day, a nephew of the elder Day, who had commenced business as a blacking maker, and was using a label of the same color and size, with the letters arranged precisely the same and with the same name, "Day and Martin," on the boxes.   The defendant was enjoined, the court placing its decision, not upon any peculiar or exclusive right that the plaintiff had to use the name of Day and Martin, but upon the fact of the defendant using the names with certain circumstances, and in a manner calculated to mislead the public.   The court observed : " He (the defendant) has a right to carry on the business of a blacking manufacturer honestly and fairly ; he has a right to the use of his own name; I will not do anything to deprive him of that or any other name calculated to benefit himself in an honest way ; but I must prevent him from using it in such a way as to deceive and defraud the public."   In *Holloway* v. *Holloway*, 13 Beavan, 209, Thomas Holloway had for many years made and sold pills and ointments under the label " Holloway's Pills and Ointments."   His brother Henry Holloway subsequently manufactured pills and ointments with the same designation.   The pill-boxes and pots (of ointment) of the latter were similar in form to, and were proven to have been copied from, those of the former.   The Master of the Rolls in granting the injunction said : " The defendant's name being Holloway, he has a right to constitute himself a vendor of Holloway's pills and ointments, and I do not intend to say anything tending to abridge any such right.   But he has no right to do so with such additions to his own name as to deceive the public, and make them believe that he is selling the plaintiff's pills and ointments.   The evidence in this case clearly proves that pills and ointments have been sold by the defendant, marked in such a manner that persons have purchased them of the defendant, believing that they were buying goods of the plaintiff."   The principle of this case was approved by this court in the case of *McLean* v. *Fleming*, 96 U. S. 245, in which a person was enjoined from using his own name in connection with certain pills, upon the ground that they were put up in such form that purchasers exercising ordinary caution were

likely to be misled into buying the article as that of the plaintiff. These cases obviously apply only where the defendant adds to his own name imitations of the plaintiff's labels, boxes or packages, and thereby induces the public to believe that his goods are those of the plaintiff. A man's name is his own property, and he has the same right to its use and enjoyment as he has to that of any other species of property. If such use be a reasonable, honest and fair exercise of such right, he is no more liable for the incidental damage he may do a rival in trade than he would be for injury to his neighbor's property by the smoke issuing from his chimney, or for the fall of his neighbor's house by reason of necessary excavations upon his own land. These and similar instances are cases of *damnum absque injuria.* In the present case, if the words are not in themselves a trade mark, they are not made a monopoly by the addition of the proprietor's name, provided, of course, the defendant be legally entitled to make use of the same name as connected with his preparations.

The theory of a trade mark proper then being untenable, this case resolves itself into the question whether the defendants have, by means of simulating the name of plaintiff's preparation, putting up their own medicine in bottles or packages bearing a close resemblance to those of plaintiff, or by the use of misleading labels or colors, endeavored to palm off their goods as those of the plaintiff. The law upon this subject is considered in the recent case of *Lawrence Mfg. Co.* v. *Tennessee Mfg. Co.,* 138 U. S. 537. The law does not visit with its reprobation a fair competition in trade; its tendency is rather to discourage monopolies, except where protected by statute, and to build up new enterprises from which the public is likely to derive a benefit. If one person can by superior energy, by more extensive advertising, by selling a better or more attractive article, outbid another in popular favor, he has a perfect right to do so, nor is this right impaired by an open declaration of his intention to compete with the other in the market. In this case, the usual indicia of fraud are lacking. Not only do defendants' bottles differ in size and shape from those of the plaintiff, but their labels and cartons are

so dissimilar in color, design and detail that no intelligent person would be likely to purchase either under the impression that he was purchasing the other.  There are certain resemblances in the prescriptions and instructions for the use of the respective preparations, but no greater than would be naturally expected in two medicinal compounds, the general object of which is the same.  Under such circumstances, a certain similarity in the methods of using and recommending them to the public is almost unavoidable.  While the resemblances in this case are perhaps too great to be considered the result of mere accident, the dissimilarities are such as to show an intention to avoid the charge of piracy.  The similarities in the advertising cards or posters are undoubtedly much greater, — both being a deep yellow in color, with an arrangement and shape of letters closely approaching identity, and, if this resemblance had been carried into the labels, we should have regarded it as strong evidence of a fraudulent intent; but as it appears from the testimony that the use of these posters has been discontinued, and further that the defendants in this case never employed them or put them up, or authorized others to do so, it is clear that as against these defendants the court cannot now be properly called upon to enjoin them.  If the bare act of posting these advertising cards were fraudulent, the remedy is against the party who committed the wrong.  That act does not affect the labels on the bottles, with which alone the defendants are concerned, and it has relation only to a mode of advertising, distinct from the medicine as offered to the public by the defendants.

In the published drug list of C. J. Lincoln & Co., the manufacturers of defendants' preparation, they advertised both of these articles, one under the head of "bitters" and the other under the head of "tonics."  Defendants' testimony shows that while they have sold but a few gross of Brown's Iron Tonic, they have been selling the Iron Bitters since October, 1881, in large quantities.  The testimony of a number of druggists doing business at Little Rock indicates that the two preparations are known to the trade and purchasers as distinct and separate, and that one is never mistaken for the

other. That the plaintiff itself did not consider that Lincoln & Co. were infringing upon its rights is evident from the correspondence between them in the summer of 1882. From this correspondence it appears that Lincoln & Co. were dealing with the plaintiff, which wrote them under date of August 21, 1882: "We notice you are manufacturing a Brown's Iron Tonic. Is this a new medicine? If so, are you not trespassing upon our rights, etc.?" To this Lincoln & Co. replied, saying that they had begun the manufacture of the Iron Tonic since the admission of Mr. E. L. Brown into their firm, in May, 1881, enclosing them a bottle of the preparation, and assuring them that they had no desire to make money upon their good reputation, and had never attempted to sell their tonic as that of the plaintiff. To this the plaintiff replied as follows :

"BALTIMORE, MD., *August* 28, 1882.
"Messrs. C. J. LINCOLN & Co.,

Little Rock, Ark.

"GENTLEMEN : Enclosing your invoice, thank you for your kind and satisfactory letter. We wish the Brown's Iron Tonic a success, as, upon examination, we cannot see where it conflicts with us except in the multiplicity of the Brown family. Your friends,

"BROWN CHEMICAL COMPANY."

Indeed, the controversy between these parties seems to have arisen some months afterward, through a trade circular issued by Lincoln & Co., in the autumn of 1882, in which they called attention to the distinction between the bitters and the tonic as rival remedies, and offered the latter at a lower price, at the same time recommending it as a superior remedy. While of course the plaintiff is not estopped by this letter to claim an infringement of its rights, it tends very strongly to show that the persons who were most actively interested in putting an end to this alleged fraud were satisfied in their own minds that no fraud was intended. The testimony is particularly cogent in view of the fact that suit was not begun until nearly four years after the letter was written.

The right of the plaintiff to maintain this bill then must rest upon the assumption that the words "Brown's Iron Tonic" bear such a resemblance in sound and appearance to the words "Brown's Iron Bitters." that the public are liable to be misled. But if the words "Iron Bitters" cannot be lawfully appropriated as a trade mark, it is difficult to see upon what theory a person making use of these or similar words can be enjoined. We understand it to be conceded that these words do not in themselves constitute a trade mark; it follows then that another person has the right to use them, unless he uses them in such connection with other words or devices as to operate as a deception upon the public. If the defendants be liable at all, then it must be by the addition of the patronymic "Brown" to the words "Iron Tonic." But the evidence shows that the preparation was originally compounded by a person of that name of whom the present manufacturers are the successors in business, and, in the absence of testimony tending to show an intention to palm off their preparation as that of the plaintiff, they have a right to such use.

It is claimed, however, that, even conceding Brown's right to use his own name as connected with the manufacture of the Iron Tonic, he could not transfer such right to a person of different name, and thereby authorize the latter to make use of it. Whatever may have been the respective rights of Brown and Lincoln to this name, the plaintiff does not stand in a position to question the right of Brown to transfer his interest in the business, and to include in such transfer the right to the use of his name in connection with the preparation of the tonic, as part of the good will of the business. In the case of *Kidd* v. *Johnson*, 100 U. S. 617, 620, it was held that the owner of a trade mark which is affixed to articles manufactured at his establishment may, in selling the latter, lawfully transfer to the purchaser the right to use the trade mark, and, in delivering the opinion of the court, Mr. Justice Field observed : " But when the trade mark is affixed to articles manufactured at a particular establishment, and acquires a special reputation in connection with the place of manufacture, and that establishment is transferred, either by contract or operation of law

to others, the right to the use of the trade mark may be lawfully transferred with it. Its subsequent use by the person to whom the establishment is transferred, is considered as only indicating that the goods to which it is affixed are manufactured at the same place and are of the same character as those to which the mark was attached by its original designer."

So in *Menendez* v. *Holt*, 128 U. S. 514, it was held that when a partner retires from a firm, assenting to, or acquiescing in the retention by the other partners of the old place of business, and the future conduct of the business by them under the old name, the good will remains with the latter, as of course, and that, under such circumstances, the right to use a trade mark passes to the remaining partners as a part of such good will. There are a few cases indicating that the mere right to use a name is not assignable, notably *Chadwick* v. *Covell*, 151 Mass. 190, but none that it may not be assigned to an outgoing partner or to a successor in business as an incident to its good will. *Ainsworth* v. *Walmesley*, L. R. 1 Eq. 518; *Derringer* v. *Plate*, 29 California, 292.

There was no error in the decree of the court below, and it is therefore

*Affirmed.*