THE PECK BROTHERS & COMPANY v. PECK BROS. CO. et al.

(Circuit Court of Appeals, Seventh Circuit. January 21, 1902.)

No. 818.

1. UNFAIR TRADE—ADOPTING SIMILAR CORPORATE NAME—RIGHT TO INJUNCTION.

"Peck Brothers & Co.," a Connecticut corporation, conducted business in that state as a manufacturer of brass and plumbers' goods for over 30 years, during which time its goods became widely known over the country, and attained a high reputation. Becoming embarrassed, a suit was instituted by stockholders for a dissolution and receivership, for the purpose of reorganization. The receivers continued the business until by order of the court the entire property, good will, trade-marks, etc., of the company, were sold to a committee representing all the stockholders, who reorganized under the name of "The Peck Brothers & Company" and the old corporation was dissolved. Prior to the receivership the company maintained a branch house for the sale of its goods in Chicago, which was in charge of three stockholders, one of whom, whose name was Peck, was vice president of the company, and one of the complainants in the receivership suit. Another of the number was appointed ancillary receiver of the Chicago property. Pending the receivership such parties, with the possible exception of the receiver, and joined by the attorney for the receiver and one other, procured a charter from the state of Illinois for a corporation under the name of "Peck Bros. Co." to engage in the same business, in which company the ancillary receiver also became a stockholder and officer prior to his resignation as receiver. The Eastern receiver, having learned such facts from outside sources, protested against the use of the name before the organization of the new company was completed, and directed the Western receiver not to recognize it. The new company purchased the Chicago stock of the old, but not its good will. There was but one person named Peck interested in the new company. Both companies continued in business in the same territory, and a considerable confusion of goods resulted, even with experienced purchasers, owing to the similarity of the names with which such goods were stamped. *Held,* that the name of the new company, which was unwarranted in fact, because there were no "Peck brothers" interested therein, was clearly adopted for the fraudulent purpose of obtaining the advantage of the reputation and established trade of the old company, and in violation of the duty which its organizers owed to the old company as stockholders, and that the carrying on of business thereunder in the manner shown constituted unfair competition, against which the old company was entitled to an injunction.

2. TRADE-NAMES—TRANSFER BY SALE OF GOOD WILL OF CORPORATION—RIGHTS OF SUCCESSOR.

The sale under a decree of court of all the property of a manufacturing or commercial corporation, including "its franchises, name, and good will," to a reorganization committee representing all its stockholders, passes to the purchasers and the reorganized company the right to the old company's trade-name, and to protection in its exclusive use to the same extent that such protection could have been invoked by the old company, had it continued in business.

3. SAME—SUIT AGAINST CORPORATION FOR INFRINGEMENT—EFFECT OF STATE CHARTER.

The fact that a corporation has been chartered by a state under a certain name, which it selected, does not afford it immunity from a suit in a federal court by a corporation of another state to enjoin it from prosecuting its business under such name, where the name was deliberately adopted by its incorporators in imitation of complainant's for the fraudulent purpose of deceiving the public and appropriating complainant's good will and reputation.

Appeal from the Circuit Court of the United States for the Northern District of Illinois.

The appellant, a corporation of the state of Connecticut, filed its bill against the corporation "Peck Bros. Co." and the individual defendants, who are its officers and directors, to restrain (1) the use of the name "Peck Bros. & Co." or "Peck Bros. Co." or "Peck Bros." or names substantially identical therewith, in connection with the prosecution of the business of the manufacture, purchase, and sale of plumbing, gas and steam fitting materials and supplies, fixtures, brass and iron goods; (2) from holding out or representing that the goods manufactured by them are the same as those manufactured by the complainant; and (3) from using or interfering with the paramount right of the complainant to the name of "Peck Brothers & Co.," or "Peck Bros.," or "Peck Bros. Co.," in connection with the manufacture and sale of goods of the character stated; and seeking also to recover damages sustained by reason of the alleged unauthorized interference with the complainant's paramount right in the use of the names stated. The bill was answered to, and upon the evidence taken the court below on July 8, 1901, dismissed the bill for want of equity.

Elnathan Peck and his two sons, J. M. Peck and Henry F. Peck, under the firm name of E. Peck & Sons, in the year 1859, commenced the business of the manufacture of brass goods for plumbers and gas and steam fitters at New Britain, in the state of Connecticut. In the year 1862, the corporation "Peck Brothers & Co." was organized, and became the successor in business of the firm of E. Peck & Sons. This corporation was composed, in part, at least, of the two sons of Elnathan Peck, and the plant of the business at that date had been removed to the city of New Haven. The capital stock of the corporation was originally $35,000. This was increased from time to time until in March, 1896, it was $750,000. The business had greatly grown in volume, and its product had become well and thoroughly known to the trade throughout the country as "Peck Brothers' Goods." Branch offices for the sale of its product were established in the cities of New York, Boston, and Chicago,—in the latter city in the spring of 1889. The office in Chicago was placed in the charge and management of the defendants Oliver D. Peck and Albert D. Sanders. The former was then a stockholder in, and the secretary of, the Connecticut corporation, and was its vice president from 1894 to 1896, and is now the president of the defendant corporation. The latter was a stockholder in the Connecticut corporation, and conducted the branch on a salary, and is now the general manager of the defendant, corporation. The defendant William A. Ratcliffe was also a stockholder in the Connecticut corporation, and was the principal salesman in the Chicago branch, and is now the secretary of the defendant corporation. On the 14th day of March, 1896, the corporation became embarrassed; and a bill was filed in the superior court of the county of New Haven, Conn., by the owners of a majority of the stock, against the corporation, for the appointment of a receiver. Oliver D. Peck, one of the defendants in this suit, was a plaintiff in that suit. Receivers were duly appointed, who took charge of the corporation and managed its business. On March 16, 1896, the defendant Oliver D. Peck, with others, filed an ancillary bill in the circuit court of the United States for the Northern district of Illinois, upon which the defendant Albert D. Sanders was appointed ancillary receiver of the corporation with respect to its property in the state of Illinois, for the benefit of the principal receivers, appointed by the superior court for the county of New Haven, Conn. On June 25, 1896, Henry D. Coghlan, W. J. Naughton, and George C. Morton filed with the secretary of state of the state of Illinois a certificate signed by them, respectively, in which they proposed to form a corporation under the name of "Peck Bros. Co.," for the manufacture and sale of plumbing, gas fitting, steam fitting, sewer pipe, sewer building materials and supplies, also hardware, brass, and iron goods, metals, and machinery, with a capital stock of $75,000, divided into 750 shares; the principal office of the company to be located in the city of Chicago. A license was thereupon issued to them as commissioners to open books for subscription for the capital stock. On August 21, 1896, they re-

ported to the secretary of state that the stock was fully subscribed as follows: Oliver D. Peck, 100 shares, amounting to $10,000; Henry D. Coghlan, 200 shares, $20,000; William A. Ratcliffe, 72 shares, $7,200; James L. Ratcliffe, 378 shares, $37,800,—and that there had been elected as directors the four subscribers to the capital stock and George C. Morton, whereupon on that day the secretary of state issued his certificate "that the said Peck Bros. Co. is a legally organized corporation under the laws of this state." Mr. Coghlan, who subscribed for 200 shares, was the attorney of the Chicago branch and was one of the attorneys of the defendant Sanders as receiver, and is one of the solicitors of record for the defendants in this suit. The bill charges the fact to be "that, although the name of the defendant Albert D. Sanders does not appear as one of the incorporators of the defendant 'Peck Bros. Co.,' he was directly interested and contributed toward the payment upon the shares of its capital stock, and that as your orator is informed and believes, the two hundred shares of capital stock of said corporation subscribed by Henry D. Coghlan were in reality a subscription in trust for and in behalf of the defendant Albert D. Sanders; that the said Henry D. Coghlan was the confidential attorney of the said Albert D. Sanders both before and after his appointment as ancillary receiver; that said Albert D. Sanders immediately upon resigning his said receivership became the general manager of the defendant 'Peck Bros. Co.,' and has continued to be such general manager up to this time, and has taken an active part in the conduct and management of the affairs of said corporation from the time of its creation." To this allegation the defendant Albert D. Sanders answered that he "denies that on the 25th day of June, 1896, he conspired with the defendants William D. Peck and William A. Ratcliffe for the purpose of obtaining the name and good will and business of the firm of Peck Bros. & Company. He denies that he had anything to do with the organization of Peck Bros. Company, the defendant company. He denies that the subscription of Henry D. Coghlan to the capital stock of Peck Bros. Company was a subscription in trust for this defendant. He denies that the said Henry D. Coghlan was his confidential attorney, either before or after his appointment as ancillary receiver, but represents the fact to be that Henry D. Coghlan was the attorney for Peck Bros. & Company of New Haven, Conn., for years prior to its insolvency, and after its insolvency acted in connection with E. A. Otis as attorneys of the receivers in winding up the affairs of Peck Bros. & Company, and that everything done by the said Henry D. Coghlan in the organization of Peck Bros. Company was done for purposes and reasons unknown to this defendant, and in no way connected with him." All the defendants, except the defendant James L. Ratcliffe, "further answering, deny that the plaintiff has the exclusive right to the use of the name 'Peck Bros. & Co.,' 'Peck Bros. Co.,' or 'Peck Bros.,' or the name of 'Peck,' in connection with its said business. These defendants aver and charge that the defendant Peck Bros. Company is alone entitled to the use of the said name or names; that it was duly incorporated under the laws of the state of Illinois long prior to the complainant; that it purchased the assets and good will of the Western branch of Peck Bros. & Co.; that its company is headed by Oliver D. Peck, of the original firm of Peck Bros. & Co., who acts as its president; and that it had been in existence and doing business since June, 1896, and under the name adopted has built up a large business, which it alone is entitled to share and enjoy." No evidence was taken on behalf of the defendants below, except the deposition of one Wilson, the representative of the defendant corporation in the city of New York, touching the location of its office in that city.

There were negotiations in the spring of the year 1896, between the Connecticut receivers and Mr. Sanders, the ancillary receiver, on the one hand, and William A. Ratcliffe, representing a syndicate for the purchase of the property of the Connecticut corporation located in the city of Chicago. It was unknown to the Connecticut receiver who composed that syndicate. After some negotiation a price was fixed for the goods, and the sale was finally consummated in the month of September. The Connecticut receivers heard of the proposed new corporation in Illinois, not from the parties, but from some person on the outside, and on August 8th wired Mr. Sanders

as follows: "We object to title of new company. Avoid recognizing in any way,"—and on the same day addressed to him the following letter:

"New Haven, Conn., August 8, 1896.

"Mr. A. D. Sanders, Receiver, Chicago—Dear Sir: Since we heard of the organization of the new company to succeed to our business in Chicago, we have seriously considered the matter of allowing them to use the name Peck Bros. in any way, and in conversation with one of our prominent stockholders, Mr. W. H. Hart, he decidedly objected to it. While the intentions of the projectors might be all right, I can readily see where serious complications might arise from any company doing business in the same line under the name of Peck Bros., and we shall be under the necessity of refusing to recognize this company by making any sale of goods to them. I have just wired you to this effect, and I think, if you will stop to consider the matter, you will readily see the necessity of our entering the protest. I presume there may be some way by which the use of this name might be permitted under restrictions and limitations, but have not had an opportunity, as yet, of consulting our attorney in reference to the matter. I thought best to enter the protest, and will notify you and write you further after consultation with our attorney.

"Yours truly,                                              J. M. Peck, Receiver."

On August 14, 1896, he addressed a letter to "Mr. W. A. Ratcliffe, Agent for the Peck Bros. Co.," which contains the following: "We have talked over the matter of the name of the new company, viz., 'The Peck Bros. Co.,' and we could see where it could and might be used by you to the detriment of the business of Peck Bros. & Co., but I had your assurance when in conversation with you that your idea in taking the before-mentioned name was to preserve the present channels of trade for Peck Bros. & Co.'s goods so far as possible, and so far as it could be made mutually advantageous. To this we can see no objection, but if at any time in the future Peck Bros. & Co. should find that goods were on the market not of their manufacture but marked 'The Peck Bros. Co.' we have no doubt but the name of the new company is, in our opinion, so near like the old that it would at least warrant a trial of the matter in the courts. As no such case is likely to arise during the receivership, we think the matter can probably be left to the future board of directors of Peck Bros. & Co. In the meantime we shall consider that you are to sell Peck Bros. & Co.'s goods in Chicago and vicinity, and that all orders for goods shall be referred to you, and that we will not give competing prices against you." On August 24th he addressed a letter to Mr. Sanders, receiver, with reference to an inventory of the property at Chicago, in which he stated: "I did say to both you and Mr. Ratcliffe that I did not think it best for you to have any connection with the new firm until the matter was fully closed out, and I distinctly said that this was for your own interest." The negotiations seem to have at first contemplated the acquirement of the good will and name of the Connecticut corporation. On September 23, 1896, the Connecticut receiver wired Mr. Sanders: "Receivers have no authority to sell good will nor make contracts extending beyond the receivership. Instructions of August 14th cover all we can do. If those terms are not sufficient, call the deal off, and we will advise you further."

On September 23, 1896, the defendant Albert D. Sanders, the ancillary receiver, filed his petition in the ancillary suit, representing that the stock of goods in Chicago was valued at $37,665.60, and that the Illinois corporation, "Peck Bros. Co.," had offered to purchase the same for $18,830.80 in cash; that he submitted the proposition to the principal receiver of the Connecticut corporation, and had been instructed to procure authority of the court to consummate the sale,—and an order was entered by the court authorizing the sale of the goods, which sale was consummated. The order did not authorize the sale of any good will or trade-name, but simply all the stock on hand. In December, 1896, Mr. Porter, the Connecticut receiver, visited Chicago, and called at the office of the defendant corporation. He then found the defendant Sanders engaged in the service of that corporation. Subsequently, and on December 31, 1896, Sanders resigned as ancillary

receiver, and on the same day Joseph Porter was appointed ancillary receiver in his place. The reports of the ancillary receiver showed payments of $500 to Henry D. Coghlan for services as solicitor of the receiver. On December 17, 1897, the New Haven court entered a decree, upon the application of the Connecticut receiver, for the sale of the property of the New Haven corporation, and directed "that Joseph Porter, the receiver of Peck Brothers & Company, be, and he is hereby, authorized and empowered to sell all of the property of said company, of every kind and wheresoever situated, including its franchises, name and good will," in such manner as, in the judgment of the receiver, would realize the greatest amount. The decree further provided that creditors and stockholders might bid at the sale. The report of the receiver, filed March 11, 1898, declares that the receiver offered for sale at public auction to the highest bidder at the designated date the entire property of the corporation, including its "franchises, name, and good will, and all other assets of every kind, and wheresoever situated." At that sale, P. N. Welch, F. C. Hollins, and H. C. Warren, who were agents for the committee of stockholders of the corporation, purchased the property, good will, etc., for the sum of $265,520. The report of the sale was on the same day confirmed, and the receiver was ordered to execute and deliver to such person or persons as shall be designated in the written request of the agents of the committee of stockholders who purchased said property a proper deed of conveyance. On the 4th day of April, 1898, Welch, Warren, and Hollins, as trustees of the stockholders in the original corporation, uniting with others, entered into articles of organization of the "Peck Brothers & Company," the appellant here, which was filed with the secretary of state of the state of Connecticut on the 5th day of May, 1898. The number of shares of the corporation was 24,000, of the par value of $25 each, and were fully subscribed for. Welch, Warren, and Hollins, as trustees of all the stockholders, subscribed for 23,836 shares. On May 5, 1898, the receivers of "Peck Brothers & Co.," the original Connecticut corporation, having received a written request from the trustees of all the stockholders to deliver a bill of sale to the new corporation "Peck Brothers & Company," conveyed to the last-named corporation all the property of the old company, "together with the franchises, name, and good will, and all trade-names, trade-marks, and patents and all other assets of every kind, and wheresoever situated, belonging to said Peck Brothers & Company, or to me as receiver thereof." On May 10, 1898, the receiver reported to the court, among other things, that he had received the final payment for the property and franchises sold; "that a committee representing all of the stockholders of said defendant corporation has purchased all of the property and franchises and name of said company, and has caused a new corporation to be organized for the benefit of the stockholders of the defendant company, and has transferred all of the property and franchises and the name of the defendant company to said new corporation; and that said committee, representing all of the stockholders of said defendant company, desires that said defendant company shall be dissolved, and has requested the undersigned to apply to this court for an order of dissolution." Thereupon on that date an order was entered by the court reciting the report of the receiver, "and the committee representing all stockholders of said defendant company, appearing by their attorneys, Alling, Webb & Morehouse, and joining in the prayer for dissolution, and, the facts recited in said report having been found to be true," it was ordered that the corporation in that case be dissolved, and its corporate existence terminated.

The record is replete with evidence touching the question of confusion of goods, and in the sales thereof. The defendant corporation, having its headquarters in Chicago, reaches out for its trade throughout the East and throughout the territory covered by the complainant corporation. Its goods are stamped, "Peck Bros. Co. Chicago." The stamp of both corporations upon their goods is necessarily in small letters, requiring close inspection to distinguish. The evidence discloses that in repeated instances experienced plumbers had purchased the goods made by the defendant corporation, supposing them to be the goods manufactured by the complainant corporation; and much confusion is proven to have occurred in the delivery of letters,

checks, and statements forwarded by mail. Upon the question of confusion of goods there is no dispute.

E. A. Otis and Henry C. White, for appellant.

H. D. Coghlan, for appellees.

Before JENKINS and GROSSCUP, Circuit Judges, and BAKER, District Judge.

JENKINS, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

Upon the evidence in this case, we think we are warranted in saying of this defendant, as we had occasion to say of another corporation under circumstances not dissimilar, that "it was conceived in sin and brought forth in iniquity, that wrong attended at its birth, and that fraud stood sponsor at its christening, imposing upon the corporate child a name to which it was not entitled, and which it had no right to bear." Kathreiner's Malzkaffee Fabriken Mit Beschraenkter Haftung v. Pastor Kneip Medicine Co., 27 C. C. A. 351, 82 Fed. 321. The original Connecticut corporation had builded up a large manufacturing interest. Its goods were of superior quality, and commanded higher prices in the market than the goods of other dealers. They were universally known to the trade as "Peck Brothers' Goods." The name indicated the origin, and was a guaranty of the superior excellence of the goods, and was so recognized by all dealing in them. The name and designation was a property right belonging to, and a valuable asset of, the original Connecticut corporation. Its financial embarrassment caused no suspension of its manufacture or trade. That was continued by the receivers appointed under the bill filed manifestly for the purposes of reorganization. The defendant Oliver D. Peck was at the time the vice president of the Connecticut corporation, and bound by his duty to abstain from injuring its good will and trade name. So, likewise, were the defendants Albert D. Sanders and William A. Ratcliffe thus obligated. Each of them was a stockholder in the Connecticut corporation; the former the manager, and afterwards the receiver, of its Chicago branch, and the latter its principal salesman. So long as they occupied those relations of trust, they were bound in honor to refrain from acts detrimental to the company, and which would undermine its business and affect the value of its trade-name. Mr. Coghlan, one of the incorporators of the Chicago company, was the counsel of the Connecticut company for its Chicago branch, and was one of its counsel in the receivership proceedings in the Northern district of Illinois; and while that confidential relation continued he also was bound by ordinary professional ethics to take no part in a proceeding which must necessarily prove injurious to his client. Pending the proceedings for reorganization, and before it was known whether the corporation would be reorganized, or its property and assets disposed of to others, Coghlan, with two companions, proposed to form a corporation under the title "Peck Bros. Co." to carry on a like business, and, as events have proven, within the territory occupied by his client. Peck, William A. Ratcliffe, and

Coghlan were three of the four subscribers to the stock of that company, and were three of its five directors. They assumed a name to which they had no warrant of right. There were no brothers Peck interested in this new enterprise. There was but one Peck. The name assumed was itself a falsehood, and we must believe that it was so assumed for a purpose. The fact of the proposed incorporation was by these parties either designedly concealed from, or was not made known to, the officers or the Eastern receivers of the Connecticut corporation; but the fact that such incorporation was proposed incidentally came to the knowledge of the Connecticut receivers, and as early as August 8th they wired to the defendant Sanders, who manifestly was not unfriendly to the proposed corporation, objecting to the title of the new company, and directing him to avoid recognizing it in any way. This was nearly two weeks before the incorporators met to elect a board of directors. On August 14th the Connecticut receiver addressed a letter to the defendant William A. Ratcliffe, likewise protesting against the use of the name to the injury of the Connecticut corporation. So that they proceeded with this incorporation, assuming a name to which they had no right, with knowledge that they who were then in charge, as officers of the court, of the rights of the stockholders of the Connecticut corporation, protested against the assumption of the name. Here, therefore, was no mere mistaken action, but a deliberate assumption of a name which, as we think, the corporation had no right to bear. We need not stop to inquire too curiously with respect to the real part played by the defendant Albert D. Sanders in this transaction. That he was knowing to it all cannot be doubted. He and his codefendants, it is true, deny all conspiracy to defraud; but they content themselves with mere denial. Having submitted to answer, they should have answered fully. In view of the allegations of the bill, it was incumbent upon all of the defendants having knowledge to have informed the court whether Coghlan's subscription was for himself or for others, or in part for himself and in part for others; whether his own money paid for his subscription to the stock, or whether it was in whole or in part paid for by others, and by whom. The fact that the defendant Albert D. Sanders was the general manager of the Chicago branch, and that within a few months after the incorporation, and while still receiver, he was, either as general manager or in some responsible position, aiding in the management of the affairs of the new corporation, made it incumbent upon him not merely to deny without explanation, but to fully explain, especially in view of the fact that it is conceded that he is now a stockholder and officer of the new corporation. But no word of explanation comes. They refrain from thus speaking by their answer. They refrain from testifying upon the hearing. Upon this whole business, and with respect to their connection with it, the defendants are as silent as the sphinx. We cannot but believe that the corporation was formed with a view to obtain, rightfully or wrongfully, the good will and trade-name of the Connecticut business. Indeed, the answer asserts that the company was formed "to buy the assets and good will of the insolvent con-

cern," and "for the purpose of taking off the hands of the receiver the assets and good will of the Western branch." This affirmative allegation required of them proof of the fact, but that evidence is not forthcoming. If, however, the allegations of the answer were true, while it might acquit the defendants of "original sin," the wrongful assumption of the name and the prosecution of the business thereunder would, as against the lawful proprietors of the name and business conducted under it, render the enterprise illegal. The new corporation did not acquire any right or title to the trade-name or the good will of the Connecticut business. The receivers declined absolutely to deal with the Chicago parties upon any such postulate, and instructed the defendant Sanders, if that were insisted upon, to "call the deal off." The order of sale by the circuit court of the United States for the Northern district of Illinois carefully omits any inclusion of the trade-name or good will, and all that the defendant corporation acquired by the sale was the stock of goods at Chicago. There is here either original wrongful intent, or, if the design were originally honest, it became wrongful upon failure to acquire by purchase the business and trade-name.

It is now so well settled, both by the decisions of the supreme court and of this court, that the wrongful use of one's own name to the injury of another, which results in the palming off upon the public his goods as the goods of that other, will be restrained, that it is not needful to review the authorities. We need only refer to a few: Elgin Nat. Watch Co. v. Illinois Watch Co., 179 U. S. 665, 675, 21 Sup. Ct. 270, 45 L. Ed. 365; Meyer v. Medicine Co., 7 C. C. A. 558, 58 Fed. 884, 18 U. S. App. 372; Pillsbury v. Flour Mills Co., 24 U. S. App. 395, 12 C. C. A. 432, 64 Fed. 841; Stuart v. Stewart Co., 33 C. C. A. 480, 91 Fed. 243. See, also, Tussaud v. Tussaud, 44 Ch. Div. 678. While one may have the right to use his own name honestly in his own business, for the purpose of advertising he cannot resort to any artifice or do any act calculated to mislead the public as to the identity of the business, firm, or establishment, or the article produced, and thus work injury beyond that which results from mere similarity of names. Chemical Co. v. Meyer, 139 U. S. 540, 11 Sup. Ct. 625, 35 L. Ed. 247. Here the artifice consisted not in using one's own name, but in assuming falsely the name "Peck Bros.," there being no brothers of that name in the incorporation. The name, manifestly, was thus assumed for the purpose of obtaining the good will of the established business of the Connecticut corporation, resulting, failing the acquirement by purchase of the business, good will, and trade-name, in fraud upon the public, and injury to the legitimate proprietors of the business and trade-name.

The stockholders of the original Connecticut corporation "Peck Brothers & Co.," including the defendants Peck, Sanders, and William A. Ratcliffe, reorganized under the corporate name of "The Peck Brothers & Company," and, under the proceedings in the Connecticut court, acquired the business, good will, and trade-name of the old corporation. Beyond question, the right to the trade-name passed by the proceedings to the complainant corporation. Kidd v. Johnson, 100

U. S. 617, 25 L. Ed. 769; Chemical Co. v. Meyer, 139 U. S. 547, 11 Sup. Ct. 625, 35 L. Ed. 247; Nervine Co. v. Richmond, 159 U. S. 302, 16 Sup. Ct. 30, 40 L. Ed. 155; Sarrazin v. Tobacco Co., 35 C. C. A. 496, 93 Fed. 624, 46 L. R. A. 541; LePage Co. v. Russia Cement Co., 2 C. C. A. 555, 51 Fed. 941, 17 L. R. A. 354; Bank of Tomah v. Warren, 94 Wis. 151, 68 N. W. 549; Warren v. Warren Thread Co., 134 Mass. 247.

It is objected, however, that equity cannot extend its preventive arm to stay this wrong, because the defendant acquired the right to be a corporation from the state of Illinois, and that its name was given to it by the state, and that, since a foreign corporation can prosecute business in a state only by comity, it cannot obtain an injunction from a federal court against the formation of a domestic corporation bearing the same name. In support of this contention, thus broadly stated, reliance is placed upon the case of Hazelton Boiler Co. v. Hazelton Tripod Boiler Co., 142 Ill. 494, 30 N. E. 339. In that case, in the year 1881, one Hazelton, having invented certain improvements in steam boilers, joined with one Kennedy in the business of manufacturing and selling boilers containing such inventions, both of them being then residents of the city of New York. The business was conducted under the name of Hazelton Boiler Co.; and on July 10, 1884, Hazelton assigned his interest in the entire business, including three patents with all reissues and extensions thereof, or improvements in relation thereto, and all inventions which he might thereafter make in relation to steam boilers, to the father of his partner. On June 23, 1888, the business having in the meantime been actively carried on by Kennedy and his brother, a corporation was organized by the three Kennedys, under the laws of the state of New York, under the name of the Hazelton Boiler Co. In February, 1888, Hazelton organized a corporation under the laws of the state of Illinois, under the name of Hazelton Tripod Boiler Co., to manufacture and sell tripod boilers of the same character as those invented by him the patents for which he had sold to the Kennedys, except some minor changes in the structure of them. The statement of the case asserts the following:

"Neither the complainant nor the defendant corporation has ever been engaged in the business of disposing of its steam boilers by placing the same upon the market; both having confined themselves to dealings directly with customers purchasing for their own use, and not for sale, the sales by each corporation being all made upon orders of customers addressed to it directly in New York or Chicago, as the case happened to be; and neither kept any depository, warehouse, or sales room for the disposition of its engines, except at its home office."

The court held that there were two obstacles to recovery by the complainant, which were insuperable: The first, "that the complainant is a junior corporation seeking to contest with a senior corporation the right of the latter to the use of its corporate name"; the second, that a foreign corporation sought to contest with a domestic corporation the right of the latter to the corporate name given by the sovereignty which created it. Upon these propositions the court held that, as the incorporation of the defendant antedated

that of the complainant by nearly four months, if there was any infringement, the complainant, and not the defendant, was the aggressor; overlooking, as it seems to us, the fact that if Hazelton, as was claimed, had by the transfer to Kennedy several years before of the assets of the business transferred also the right to use his name in connection with the manufacture of boilers, he could not rightfully, under any guise or pretense, either individually or by imposing that name upon a corporation, use it in connection with the same business, if thereby the public was imposed upon by reason of the confusion of goods naturally resulting from such use. It may be that the court 'supposed that the facts above stated with reference to the conduct of the business prevented such confusion. The court also seemed to have overlooked the fact that the New York corporation was composed of the Kennedys, and was merely successor to them in the business, and possessed all the rights which they had thereto, including trade-names. Upon the second proposition the court remarked:

"But the complainant is in the attitude of a foreign corporation coming into this state and seeking to contest the right to the use of a corporate name which this state, in furtherance of its own public policy, and in the exercise of its own sovereignty, has seen fit to bestow upon one of its own corporations. For such a purpose a foreign corporation can have no standing in our courts. Such corporations do not come into this state as a matter of legal right, but only by comity, and they cannot be permitted to come for the purpose of asserting rights in contravention of our laws or public policy. It is competent for this state, whenever it sees fit to do so, to debar any or all foreign corporations from doing business here, and whatever it may do by way of chartering corporations of its own cannot be called in question by corporations which are here only by a species of legal sufferance."

We are compelled, with deference, to differ with the learned court, if it intended to hold that incorporation under the laws of the state of Illinois protects one from the consequences of his own wrong. In a certain limited sense the sovereignty of the state had conferred the name. There is, however, in the term "sovereignty," no magic to conjure by. It can confer upon individuals no right to perpetrate wrong. Nor do we think that the sovereignty of the state of Illinois sought to do that. It has a general law of incorporation, by which any body of men combining for the purpose of business may incorporate under any name they may select. The name is not imposed by the law, but is chosen by the incorporators. With that selection the sovereignty of the state has nothing to do. The act of sovereignty allowing incorporation is permissive, not mandatory. It sanctions the act of incorporation under the name and for the business proposed, if that name and that business be otherwise lawful. The sovereign by the act of incorporation adjudges neither the legality of the business proposed, nor of the name assumed. That is matter for judicial determination by a court having jurisdiction of the subject when the legality of the business or of the name is called in question. If one may not use the name imposed upon him in invitum so that it shall work wrong to another, by what token may he become incorporated under a name selected by himself to effect like wrong? And how is the sovereignty of

a great state impugned by the denial to incorporators of a right to perpetrate such a wrong? Is it possible that a sovereignty of a state can be thus invoked to perpetrate a fraud? If it may be, then indeed will that sovereignty stand for oppression, and not for justice. Then could one who, in connection with a business to which his name had been attached and had given value to it, having disposed of the right to use that name to another, and so by the law prohibited from using it in connection with a like business under circumstances that would work a fraud, be enabled to effect the fraud by simply becoming incorporated under that name under the sovereignty of the state of Illinois. We cannot bend our judgment to the conclusion that a sovereign state designed thus to confer immunity for wrong. The court, in a review of the evidence, further held that the trade-name and good will of the business were, as a matter of fact, not transferred by an assignment which merely transferred the right of the vendor to the business, "its assets, profits, and emoluments," and that the negotiations for a sale did not comprehend such transfer. Whether this legal conclusion be correct, we need not inquire; but the fact seems to have had influence, for the court seeks to distinguish the case then in hand from its decision in Frazer v. Frazer Lubricator Co., 121 Ill. 147, 13 N. E. 639, 2 Am. St. Rep. 73, in which that court held that one selling out an established business, and with it his own name to be used in connection with the business, cannot afterwards assume it in carrying on a like business; and this upon the ground that the instrument of transfer in that case expressly authorized the vendee to use the name as a trade-mark, or as indicating the material or product theretofore manufactured by the vendor, and conferred upon the vendee the exclusive authority to use his name for such purpose. The court seems to have been also influenced by the fact that as the boilers were made for use by those ordering them, and were not upon the market for sale, there could be but little, if any, confusion or improper interference. If that fact be potential, it is unavailing in the case in hand. Here the defendants reach out into the markets of the East, and persistently and deliberately place goods of their manufacture upon the market, selling them under such guise that experienced dealers are imposed upon. With respect to the denial by the supreme court of Illinois of the right of a foreign corporation to contest in the courts of that state the right of a domestic corporation to the corporate name given it by the state in its articles of incorporation, even if that name be selected in fraud and be used to perpetrate a wrong, we are not concerned. The state of Illinois has the undoubted right to regulate its own courts in its own way, and, if it so will, to turn a deaf ear to a demand for justice. A federal court, however, is organized in part to listen to complaints of citizens and corporations of one state against citizens or corporations of another state, and its doors may not be closed by any ruling of a state tribunal. We study the decisions of the highest court of a state with respectful deference, but cannot be concluded thereby in such a case as the present one, when the ruling invoked, in our judgment, works a grievous wrong. We can-

not follow the decision in the Hazelton Case. The doctrine of the Illinois court, as we conceive, is not in accord with the decisions of the federal and of other state courts. Celluloid Mfg. Co. v. Cellonite Mfg. Co. (C. C.) 32 Fed. 94; Rogers Co. v. Rogers Mfg. Co., 17 C. C. A. 576, 70 Fed. 1017; Publishing Co. v. Dobbinson (C. C.) 72 Fed. 603; Higgins Co. v. Higgins Soap Co., 144 N. Y. 462, 39 N. E. 490, 27 L. R. A. 42, 43 Am. St. Rep. 769; Holmes, Booth & Hayden v. Holmes & Atwood Mfg. Co., 37 Conn. 278, 293, 9 Am. Rep. 324. In the first of these cases Mr. Justice Bradley, of the supreme court of the United States, observed:

"As to the imitation of the complainant's name, the fact that both are corporate names is of no consequence in this connection. They are the business names by which the parties are known, and are to be dealt with precisely as if they were the names of private firms or partnerships. The defendant's name was of its own choosing, and, if an unlawful imitation of the complainant's, is subject to the same rules of law as if it were the name of an unincorporated firm or company. It is not identical with the complainant's name. That would be too gross an invasion of the complainant's right. Similarity, not identity, is the usual recourse when one party seeks to benefit himself by the good name of another."

The whole contention is well summed up by Mr. Hopkins in his recent work upon Unfair Trade:

"Where the defendant is a corporation whose corporate name includes a proper name, and was selected by its incorporators with the intent and for the purpose of deceiving the public into the belief that its goods are the goods of the plaintiff, such frauds will, of course, be enjoined." Hopk. Unfair Trade, 108.

Here the right to the name belongs to the complainant by virtue of the sale of the right to that name under the proceedings in Connecticut. The stockholders of the original corporation, including three of these defendants, are stockholders of the complainant company. The proceeding was a mere reorganization, and the complainant succeeded to all the rights of the old company, and to the equitable rights of the stockholders representing that company. The court below denied relief because the defendant company was incorporated two years prior to the incorporation of the complainant, overlooking the fact that the complainant corporation does not claim by virtue of its incorporation, but in right of the first corporation and its stockholders to the name it had acquired in the business. The right does not spring from the incorporation, but from the transfer of the trade-name and good will. The status of the complainant is precisely the same as though the original Connecticut corporation, continuing to exist and to prosecute business, was the party here complaining of the wrong. The assumption of the name "Peck Bros. Co." was of itself the utterance of a falsehood, for there were no brothers Peck interested in the incorporation. The name assumed was voluntarily selected, and, as we must believe, for the purpose of appropriating the good will and trade-name of another. If not originally so designed, it is clear that, upon failure to procure the right by purchase, the name was afterwards used for the purpose of misleading the public, and appropriating to itself, without right, the valuable trade-name of another. That wrong has been

effected. Further wrong should be prevented. The remedy, if the defendants be honest, is simple. They have but, under the law, to change the name which they selected, and which has wrought the injury. In any event, they should be enjoined from further perpetration of the wrong.

The decree is reversed, and the cause remanded, with a direction to the court below to decree for the complainant in accordance with the prayer of the bill.