## PURCELL et al. v. SUMMERS et al.
### No. 5257.

Circuit Court of Appeals, Fourth Circuit.

Nov. 13, 1944.

J. Morgan Stevens, of Jackson, Miss., and Walter McElreath, of Atlanta, Ga. (Henry R. Sims, of Orangeburg, S. C., R. T. Jaynes, of Walhalla, S. C., and R. E. Babb, of Laurens, S. C., on the brief), for appellants.

Collins Denny, Jr., of Richmond, Va. (C. T. Graydon, of Columbia, S. C., on the brief), for appellees.

Before PARKER, DOBIE, and NORTHCOTT, Circuit Judges.

PARKER, Circuit Judge.

This is the second appeal in a suit instituted by certain bishops of the Methodist Church, suing in behalf of themselves and other members of that organization, against certain former members of the Methodist Episcopal Church, South, an organization which had united with the Methodist Episcopal Church and the Methodist Protestant Church to form the Methodist church. These former members had set up a rival church organization and were claiming the right to the property and to the use of the name of the Methodist Episcopal Church, South. The purpose of the suit at the time of its institution was: (1) To obtain a declaratory judgment to the effect that the union of the Methodist Episcopal Church, the Methodist Episcopal Church, South, and the Methodist Protestant Church into one organization known as the Methodist Church was valid and that the Methodist Church had succeeded thereby to the rights and properties of the merged organizations and particularly those of the Methodist Episcopal Church, South, and (2) to restrain defendants, sued as representatives of former members of the Methodist Episcopal Church, South, who denied the validity of the union and were claiming to constitute the Methodist Episcopal Church, South, and to be entitled to its rights and properties, from using the name of that organization or any name similar thereto. On the former appeal, we reversed an order of dismissal and sustained the jurisdiction of the court below to entertain the suit, notwithstanding prior institution of local suits in state courts to determine the right to local properties. Purcell v. Summers, 126 F.2d 390.

After our decision, one of the local suits was brought on for hearing and carried by appeal to the Supreme Court of South Carolina. Although the suit was brought for the protection of a local property by members and officers of a local unit of the church against dissident members formerly associated with the unit, it involved the question of the validity of the union of the three Methodist Churches and the consequent right of the united church to property of the Methodist Episcopal Church, South, and an injunction against the use of that name by the local dissident members was asked. It was decided in that case that unification of the three churches had been validly accomplished, that the united church had succeeded to the property rights of the Methodist Episcopal Church, South, and that, consequently, the plaintiffs in that case were entitled to the local property there in controversy. The court refused to enjoin defendants there from using the name Methodist Episcopal Church, South, however, upon a finding that the united church had abandoned that name and that no confusion would result from its use. Turbeville v. Morris, 203 S.C. 287, 26 S.E.2d 821.

Following this decision of the Supreme Court of South Carolina the defendants filed an amended answer in this cause, in which they admitted the validity of the union of the churches and the right of the

united church to the property of the Methodist Episcopal Church, South, but denied the right of plaintiffs to an injunction restraining defendants from using the name of that church. When the cause came on for final hearing, the court below entered a declaratory judgment setting forth that the union of the three churches "under the new name and style of The Methodist Church was and is legal and valid, and said new church is the legal successor to all property and property rights held by the Methodist Episcopal Church, South, at the time of said union, whatever they may have been"; but the prayer of plaintiffs that defendants be enjoined from using the name of the Methodist Episcopal Church, South, was denied on the ground that the united church had abandoned that name and had no exclusive right thereto. Plaintiffs have appealed from the refusal to grant the injunction, and the question as to the correctness of that ruling is the only matter presented by the appeal.

The facts are that the three great branches of the Methodist Church were united at a conference held at Kansas City, Mo., in May 1939, after a plan of union had been agreed upon by Conferences of the Methodist Episcopal Church, the Methodist Episcopal Church, South, and the Methodist Protestant Church. The Methodist Episcopal Church, South, which was thus united with the other two churches, was a strong and virile organization with a membership of several million persons and property holdings of a value of more than $400,000,000. It has had a long and glorious history and was a powerful influence for good throughout the country, particularly in the states of the South. The name of this church, like the names of the other uniting churches was of great value, not only because business was carried on and property held in that name, but also because millions of members associated with the name the most sacred of their personal relationships and the holiest of their family traditions. How to preserve the values thus attaching to the names of the uniting bodies, while going forward with a new name under which all three could associate, was a troublesome problem. It was solved by adopting as a name the words which were common to the names of all three bodies and by having the uniting conference include the following paragraphs in its declaration of union:

"IV. The Methodist Episcopal Church, The Methodist Episcopal Church, South, and The Methodist Protestant Church, in adopting the name 'The Methodist Church' for the United Church, do not and will not surrender any right, interest or title in and to these respective names which, by long and honored use and association, have become dear to the ministry and membership of the three uniting Churches and have become enshrined in their history and records.

"V. The Methodist Church is the ecclesiastical and lawful successor of the three united Churches, and through which the three churches as one United Church shall continue to live and have their existence; continue their institutions and hold and enjoy their property, exercise and perform their several trusts under and in accord with the Plan of Union and Discipline of the United Church; and such trusts or corporate bodies as exist and in the constituent churches shall be continued as long as legally necessary."

Although 37 of the 38 Conferences of the Methodist Episcopal Church, South, had voted in favor of the union and all had finally acquiesced therein, and although the total vote of the members of the Conferences showed an overwhelming sentiment in favor of union, being 7650 votes of a total of 8897, some of those opposed to union continued to oppose it, claiming that the union was invalid and that they constituted the true Methodist Episcopal Church, South, seceded from the old organization and attempted to take the church property and church name with them. Dissident members in South Carolina held meetings at Columbia and Turbeville, S. C. in the year 1942 and organized a Conference, calling themselves a Conference of the Methodist Episcopal Church, South, and claiming the right to the property of that organization. They solicited members of the church beyond the boundaries of the state to join in the movement, and a Mid-South Conference was held as a result of which the organization was extended into eight other states. One of the primary purposes of the case before us was to prevent the use of the name of the Methodist Episcopal Church, South, by this rival organization, formed of dissident members who were claiming to be the real

continuation of the old church and to be entitled as such to its name and property.

That the use of the name of the Methodist Episcopal Church, South, by the seceding members as the name of the new and rival organization that they are creating will result in injury and damage to the united church into which the Methodist Episcopal Church, South, has been merged, is not only established by allegation and proof but it seems so clear to our minds as hardly to admit of argument. A large portion of any community is not well informed about ecclesiastical matters; and for the dissident members to use the name of the old church will enable them to appear in the eyes of the community as the continuation of that church, and to make the united church, which is in reality the continuation of the old church, appear as an intruder. In a conservative community this would almost certainly do the united church much harm in that it would enable the seceding members to attach to their rival organization many persons who would otherwise not think of leaving the united church. The united church, furthermore, will be hurt by any reproach that might be brought on the name of one of the merged churches by the faith and practices of those allowed to use that name; and it is not fair to it that such name be used by persons over whose professions of faith and practices it can exercise no control. Much property in which the united church is entitled to the beneficial interest or over which it is authorized to exercise control under the union is held under instruments which name the beneficiary as the Methodist Episcopal Church, South, or which provide that members of governing boards shall be elected by that church; and much confusion and dispute with respect to such property and the government of colleges, orphanages, societies and foundations will inevitably result from allowing a new organization of seceding members to use the same name. And in addition to all this, the old church, notwithstanding the merger, will still continue to be thought of under the old name in the minds of many of the members who have joined in the union, and gifts intended for it will be made in that name and may be lost or held only through expensive litigation, if the new organization of dissident members is allowed to use the name. Other confusion with resulting damage which cannot now be clearly foreseen must inevitably arise from the use of the old name by the seceding members. The injury reasonably to be apprehended was not overstated, we think, in the allegations of the complaint with regard thereto, which are as follows:

"34. Plaintiffs allege that it would be an incalculable and irreparable injury to The Methodist Church by the consequent impairment of its good will, and it would seriously impede its progress, if a rival church existing in the area formerly occupied by the Methodist Episcopal Church, South, and now occupied by The Methodist Church, and professing to be founded on the same Articles of Religion, should be allowed to appropriate to itself the name 'Methodist Episcopal Church, South.' The three churches, which united to form The Methodist Church, formed such union to eliminate rivalry among the churches founded on and adhering to the same Articles of Religion, and so as to utilize the combined good will acquired by each of said churches throughout their long existence for the more efficient propagation of the Gospel of Christ according to their Articles of Religion. Said three churches separately grew to their great proportions by the retention of the fidelity of their old members and by the constant accession of new members, and The Methodist Church, in the fulfilment of its Divine mission, cannot exist or grow except by the same means. The use of the name 'Methodist Episcopal Church, South', by a rival church operating in the same territory formerly occupied by that church and now occupied by its successor, The Methodist Church, would have the effect of confusing the minds and misleading many members of The Methodist Church, who are necessarily not skilled in ecclesiastical law, into the belief that The Methodist Church is not the true and lawful successor of the Methodist Episcopal Church, South, and entitled to all of its good will, property, rights and privileges; and would promote dissension and defections from said church. Further, the use of the name 'Methodist Episcopal Church, South', by such rival church would necessarily confuse the minds and mislead those persons wishing to join a church of the Methodist faith and polity as formerly held and practiced by the Methodist Episcopal Church, South, as to which of said churches they should join.

"35. Plaintiffs allege that the use of the name 'Methodist Episcopal Church, South',

by a rival church, existing in the territory formerly occupied by that church and now occupied by The Methodist Church, would result in irreparable pecuniary injury to The Methodist Church, * * *. Neither the Methodist Church, nor any other religious society, can live by faith alone but must be supported by contributions from its members and from donations, contributions and bequests from its members and others interested in its regular support and in the support of its eleemosynary institutions. The existence of a rival church using the name 'Methodist Episcopal Church, South' constitutes unfair competition and would tend to mislead and confuse the minds of those members of The Methodist Church, who became such by reason of their membership in the Methodist Episcopal Church, South, as to which of said rival organizations was rightfully entitled to their contributions; and would tend to create doubt and confusion in the minds of those willing to make donations and bequests as to which of said organizations is rightfully entitled to receive and administer such bequests."

■ Upon these facts, we do not think that there can be any doubt as to the right of plaintiffs to the injunction prayed. The use by one organization of the name of another for the purpose of appropriating the standing and good will which the other has built up is a well recognized form of the wrong known to the law as unfair competition, against which courts of equity have not hesitated, in any jurisdiction, to use the full power of the injunctive process. The general rule with adequate citation of supporting authority was thus stated by the Supreme Court of South Carolina in the comparatively recent case of Planters' Fertilizer & Phosphate Co. v. Planters' Fertilizer Co., 135 S.C. 282, 133 S.E. 706, 708:

"A court of equity has jurisdiction to enjoin the use of the same name by another corporation, or the use of a name so nearly similar as to be misleading, thereby injuring its business. American Order [of Scottish Clans] v. Merrill, 151 Mass. 558, 24 N.E. 918, 8 L.R.A. 320; National Circle [Daughters of Isabella] v. Nat. Order [of Daughters of Isabella], 2 Cir., 270 F. 723; Peck Bros. & Co. v. Peck Bros. Co., 7 Cir., 113 F. 291, 51 C.C.A. 251, 62 L.R.A. 81; 7 R.C.L. 134; Higgins Co. v. Higgins Co., 144 N.Y. 462, 39 N.E. 490, 27 L.R.A. 42,

43 Am.St.Rep. 769; [Philadelphia] Trust [Safe Deposit & Insurance] Co. v. [Philadelphia] Trust Co., C.C.Del., 123 F. 534; U. S. Light [& Heating] Co. [of Maine] v. U. S. Light [& Heating] Co. [of New York], C.C.N.Y., 181 F. 182; Celluloid [Mfg.] Co. v. Cellonite [Mfg.] Co., C.C. N.J., 32 F. 94."

■ And it is well settled that to use the name of a corporation, which has transferred its assets and good will to another, in such way as to attempt to appropriate the good will transferred and deprive the transferee of what it has thus acquired, is a wrong which should be enjoined, even though the transferring corporation is defunct at the time and the transferee is not using the name. Peck Bros. & Co. v. Peck Bros. Co., 7 Cir., 113 F. 291, 51 C.C.A. 251, 62 L.R.A. 81, certiorari denied in 187 U.S. 643, 23 S.Ct. 843, 47 L.Ed. 346; Herring-Hall-Marvin Safe Co. v. Hall's Safe Co., 208 U.S. 554, 28 S.Ct. 350, 52 L.Ed. 616, modifying 6 Cir., 146 F. 37, 76 C.C.A. 495, 14 L.R.A., N.S., 1182; Armstrong v. Atlantic Ice & Coal Corp., 141 Ga. 464, 81 S.E. 212; Goddard v. American Peroxide & Chemical Co., 67 Misc. 279, 122 N.Y.S. 360; Metropolitan Teleph. & Teleg. Co. v. Metropolitan Teleph. & Teleg. Co., 156 App.Div. 577, 141 N.Y.S. 598; and note 27 A.L.R. 1024 et seq. And see A.L.I. Restatement of Torts sec. 752 Comment (b) on kindred question as to the right of one who has discontinued the use of a trademark or trade name to enjoin its deceptive use by others.

The attempt of defendants here to appropriate the name of the old church with which they are no longer connected is governed by identically the same principle as was the case of Armstrong v. Atlantic Ice & Coal Corp., supra, 141 Ga. 464, 81 S.E. 212, 213, which is very much in point. In that case the Athens Ice & Coal Co. had sold its business and transferred its assets and good will to the Atlantic Ice & Coal Corporation and had gone out of business. Attempt was made by other persons to organize another corporation having the name of the transferor to carry on the same sort of business in the same territory. In holding that the use of the name should be enjoined as an unfair practice, the court said:

"Under the evidence in the case the court was authorized to find that this 'good will' which had been bought by the At-

lantic Company was a thing of value, and that this thing will lose at least a part of its value if another company is incorporated and permitted to operate under the name of the vendor of the good will sought to be preserved in this action brought for injunctive relief."

■ We have no doubt that these principles ordinarily applied in the case of business and trading corporations are equally applicable in the case of churches and other religious and charitable organizations; for, while such organizations exist for the worship of Almighty God and for the purpose of benefiting mankind and not for purposes of profit, they are nevertheless dependent upon the contributions of their members for means to carry on their work, and anything which tends to divert membership or gifts of members from them injures them with respect to their financial condition in the same way that a business corporation is injured by diversion of trade or custom. As was well said in the case of Master et al. v. Machen et al., 35 Pa. Dist. & Co. R. 657, which involved the use of the name of one of the branches of the Presbyterian Church:

"The close similarity raises an inference of resulting confusion. This confusion is bound to react to the disadvantage of the plaintiff. When we say disadvantage, we are not restricting ourselves to the spiritual side alone. We are aware that churches are established for the promulgation of faith under the regulations of definite religious organizations, but we are also aware that such organizations, through some administrative channels, own property, real and personal, and require funds to carry on their purposes. These funds come from contributions, gifts, donations, and bequests. No large church organization could live by faith alone, and if its income were stopped or substantially reduced, its scope for spreading its religion, as enunciated by its doctrines, would be seriously hampered. Thus, any project or movement of another religious organization using a name so similar to an established one as to create confusion and thereby interfering with the spiritual and final progress of that established church and its agencies is inequitable and will be restrained."

■ The question of protecting by injunction an eleemosynary or charitable organization, as distinguished from a business corporation, from unfair competition in the use of its name, was before us in Grand Lodge I. B. P. O. Elks v. Grand Lodge I. B. P. O. Elks, 4 Cir., 50 F.2d 860, 862, in which we examined the question thoroughly and laid down the rule, with the supporting authorities, as follows:

"It is well established that a benevolent, fraternal, or social organization will be protected in the use of its name by injunction restraining another organization from using the same or another name so similar as to be misleading. Nims on Unfair Competition and Trade-marks (3d Ed.) § 86; Thompson on Corporations (3d Ed.) § 77; Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks of the World, 205 N.Y. 459, 98 N.E. 756, Ann.Cas.1913E, 639, L.R.A. 1915B, 1074 and note; Grand Lodge, K. P. v. Grand Lodge, K. P., 174 Ala. 395, 56 So. 963; Society of War of 1812 v. Society of War of 1812, 46 App.Div. 568, 62 N.Y.S. 355; National Circle, Daughters of Isabella v. National Order of Daughters of Isabella, 2 Cir., 270 F. 723; Daughters of Isabella No. 1, v. National Order Daughters of Isabella, 83 Conn. 679, 78 A. 333, Ann.Cas.1912A, 822; International Committee of Young Women's Christian Associations v. Young Women's Christian Association, 194 Ill. 194, 62 N.E. 551, 552, 56 L.R.A. 888; Benevolent & Protective Order of Elks v. Improved Benevolent & Protective Order of Elks, 122 Tenn. 141, 118 S.W. 389; Creswill v. Grand Lodge Knights of Pythias, 133 Ga. 837, 67 S.E. 188, 134 Am.St.Rep. 231, 18 Ann.Cas. 453, reversed on other grounds 225 U.S. 246, 32 S.Ct. 822, 56 L.Ed. 1074. The reasons underlying the rule are thus stated in Nims on Unfair Competition and Trademarks (3d Ed.) § 86: 'The fact that a corporation is an eleemosynary or charitable one and has no goods to sell, and does not make money, does not take it out of the protection of the law of unfair competition. Distinct identity is just as important to such a company, oftentimes, as it is to a commercial company. Its financial credit—its ability to raise funds, its general reputation, the credit of those managing it and supporting it, are all at stake if its name is filched away by some other organization, and the two become confused in the minds of the public.'"

Directly in point here is one of the cases relied on by us in the Elks case, supra, International Committee of Young Wo-

men's Christian Associations v. Young Women's Christian Association of Chicago, 194 Ill. 194, 62 N.E. 551, 552, 56 L.R.A. 888. In that case the appellants had withdrawn from the Young Women's Christian Association because of the failure of the Association at one of its conferences to adopt a certain 'evangelical test', and, under the name of International Committee of Young Women's Christian Associations, had engaged in the general work in which the original association was engaged. In holding that the use of the name should be enjoined, the Supreme Court of Illinois said:

"It is apparent the motive for the creation of the International Committee was brought about by the failure of the International Conference to adopt the resolution requiring the 'Evangelical test.' That those persons who favored the adoption of such a resolution had a right to withdraw from the International Conference when convinced that their views were not agreeable to the majority of the conference, and to call a convention of those who were favorable to their views, and to select a committee or board of managers to have general supervision over the work of the associations comprising that convention, is not denied, and must be conceded by all. The question here, however, to be decided is, had such persons, upon their withdrawal and reorganization, a right to adopt as a name for its managing board 'International Committee of the Young Women's Christian Associations,'—a name which contains substantially the entire corporate name of appellee, a previously incorporated association, preceded by the words 'International Committee of,' which clearly indicate to the ordinary mind that appellant is a committee of appellee and the conference with which appellee is affiliated, and with which appellant has no connection, and to use that name in the conduct of its affairs? We think not. The object, work, sources of support, and field of labor of each being substantially the same, and the name of appellee having been adopted and in use by it many years prior to the incorporation of the appellant, the appellant had no right to adopt as its corporate name one so similar to that of appellee, or to incorporate in its name words which would indicate to the public that it was the representative of appellee and the conference with which appellee is affiliated. In addition to the similarity of name, and the representation contained in appellant's name that appellant is the representative of appellee and the conference with which it is affiliated, from an examination of the entire record it clearly appears that such name was adopted by the appellant advisedly and for the purpose of leading the general public, and the persons with whom it was likely to be associated, and from whom it hoped and expected to obtain support by way of donations, to believe that it stood as the committee and representative of the associations known as 'The Young Women's Christian Association,' then organized in the field where it expected to operate. Appellant may have felt justified in so doing by reason of the failure of the International Conference to adopt the 'Evangelical test,' yet such conduct, in law, amounts to a fraud upon the public and appellee."

■ And the fact that the name of the old organization is not presently being used makes no more difference in the case of a religious or charitable organization than it does in the case of a business organization. In any case the ground of relief is the element of "passing off" or implied misrepresentation which enables the one using the name to appropriate to itself the standing and good will which rightfully belong to another; and this is just as truly present when seceding members use the name of an organization which has recently merged with another under a new name as when the use of the old name has been continued. The harmful effect of the unfair competition is probably greater in the former case than in the latter; for, where the old organization is operating under a new name, opportunity is presented for doing what the defendants attempted in this case, i. e. for presenting itself to those who are devoted to the old organization as the real survival of that organization. This of course is nothing but a form of that misrepresentation or "passing off" which the courts have not hesitated to enjoin under the rules applicable to unfair competition. In the recent case of Lone Ranger v. Cox, 4 Cir., 124 F.2d 650, 652, we pointed out how broadly those rules should be applied to prevent unfair practices of this sort. That case involved the use of the name of a radio broadcast in connection with a theatrical production in such way as to suggest that there was a connection between the two. In holding that this should be enjoined as unfair

conduct by which defendant sought to appropriate to himself what rightfully belonged to another, we said:

"While the case presented is not precisely similar to that kind of unfair competition involving the use of a corporate or business name or to the ordinary case involving the unfair use of trademarks and trade names, the principle involved is the same as that recognized in these cases, viz., that a court of equity should enjoin any form of 'passing off' which involves fraudulent appropriation, through devices calculated to deceive or mislead the public, of the business or good will which another has built up. In Grand Lodge I. B. & P. O. Elks v. Grand Lodge I. B. & P. O. Elks, 4 Cir., 50 F.2d 860, and Grand Lodge, [Improved B. P. O. E.] v. Eureka Lodge [No. 5, Independent Elks], 4 Cir., 114 F.2d 46, this court applied the principle to restrain seceding members of a fraternal order from using its name for a new order which they were founding, on the ground that such use would constitute a fraud upon the original order and upon the public. In General Shoe Corp. v. Rosen, 4 Cir., 111 F.2d 95, and Little Tavern Shops v. Davis, 4 Cir., 116 F.2d 903, we applied the principle to restrain the use of otherwise permissible words to describe merchandise, in one case, and a place of business, in the other, in such way as to enable the defendants therein to appropriate to themselves the benefit of the advertising and good will of the plaintiffs. * * * 'Obviously, the question of what is unfair competition in business must be determined with particular reference to the character and circumstances of the business.' International News Service v. Associated Press, 248 U.S. 215, 236, 39 S.Ct. 68, 71, 63 L.Ed. 211, 2 A.L.R. 293. In the Elks cases, supra, it was the use of the corporate name of the original order. In General Shoe Co. v. Rosen, supra, it was the use of the word 'Friendly' in such way as to pass off shoes as having been manufactured by plaintiff. In the Little Tavern case, supra, it was the use of the words 'Little Tavern' in such way as to deceive the public into believing that the tavern was one of a chain operated by plaintiff. Here it is the use of the term 'Lone Ranger' and his distinctive call to his horse in such way as to lead to the belief on the part of children interested in the programs of the radio broadcast that the entertainment of defendants is connected in some way with these programs. In all, there is involved the element of fraudulent attempt of some one to 'reap where he has not sown' and to appropriate to himself 'the harvest of those who have sown'. Cf. Chaffee, Unfair Competition, 53 Harvard Law Review 1289, 1311."

The fact that the seceding members had been members of the Methodist Episcopal Church, South, does not justify their use of the name of that organization after they had ceased to be members thereof. The right to use the name inheres in the institution, not in its members; and, when they cease to be members of the institution, use by them of the name is misleading and, if injurious to the institution, should be enjoined. No question of religious liberty is involved. Men have the right to worship God according to the dictates of conscience; but they have no right in doing so to make use of a name which will enable them to appropriate the good will which has been built up by an organization with which they are no longer connected. In the second Elks case before this court, Grand Lodge, Improved B. P. O. E. v. Eureka Lodge No. 5, Independent Elks, 4 Cir., 114 F.2d 46, 48, we dealt with the right of seceding members to use a name which would enable them to profit by the good will of the old organization. In holding that such use of the name should be enjoined, we said:

"It is argued that in as much as defendants have been members of the order, they have the right, after seceding from it, to use so much of its name as will identify them as having been originally connected with it. * * * Where a name, not merely generic or descriptive, is adopted by an order, there is no reason why seceding members should be allowed to use it. Such use by seceding members, over whom the order has no further control, has obviously every element of unfairness that would arise from use by strangers. To say that the defendants are 'Elks' and, therefore, have the right to use the word 'Elks' in the name of their organization is to beg the question. They cease to be 'Elks' when their connection with the organization is severed. When members of the order, they are 'Elks', not in any generic or descriptive sense of that word, but in an imaginative sense. They are not elks, but men, and are called 'Elks' only because of membership in the order which has adopted that name. Upon sep-

aration from the order, their use of the name applicable to members of the order amounts to a fraud upon the order and upon the public and should be enjoined."

▮ It is said that the words "Methodist" and "Episcopal" are generic terms and that defendants have the right to use them for that reason, but defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result. They are using the precise name of the old church; and the question is, not whether they have the right to use "Methodist" or "Episcopal" in a new name so constructed as to avoid confusion, but whether they have the right to use the old name in a way that amounts, as we think it does, to implied misrepresentation to the damage of plaintiffs. The rule applicable is that applied ordinarily in cases of unfair competition and is thus stated in Nims on Unfair Competition, 3d ed. 962:

"To establish a cause of action for unfair competition it is not necessary to prove an exclusive right in plaintiff, i. e., that no one else ever has used the mark in the past or that no one else is using it now. The issue is not one of title or exclusive right but of representation, viz., what does the mark as used by plaintiff represent or mean to the public, and what in contrast, does the mark used by the defendant represent."

And see, also, Shaver v. Heller & Merz Co., 8 Cir., 108 F. 821, 65 L.R.A. 878 (opinion by Judge Walter H. Sanborn); Red Polled Cattle Club of America v. Red Polled Cattle Club of America, 108 Iowa 105, 78 N.W. 803; British-American Tobacco Co., Ltd., v. British-American Cigar Stores Co., 2 Cir., 211 F. 933, Ann.Cas. 1915B .363; Philadelphia Trust Safe Deposit & Insurance Co. v. Philadelphia Trust Co., C.C.Del., 123 F. 534; Hendriks v. Montagu, L.R. 17 Ch.Div. 638; Lee v. Haley, L.R. 5 Ch.App.Cas. 154. In the case last cited, Lord Justice Giffard thus stated the rule which we think applicable here:

"I quite agree that they have no property in the name, but the principle upon which the cases on this subject proceed is, not that there is property in the word, but that it is a fraud on a person who has established a trade, and carries it on under a given name, that some other person shall assume the same name, or the same

name with a slight alteration, in such a way as to induce persons to deal with him in the belief that they are dealing with the person who has given a reputation to the name."

▮ It follows from what has been said that plaintiffs are entitled to the injunction prayed unless they are precluded from obtaining it as a result of the decision of the Supreme Court of South Carolina in Turbeville v. Morris, supra. We do not think that decision stands in the way. In the first place, it must be borne in mind, as defendants properly conceded at the bar of this court, that on account of the difference in parties the judgment in that case does not conclude the question on the principle of res adjudicata. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22, 132 A.L.R. 741. This was pointed out on the first appeal, see, Purcell v. Summers, 4 Cir., 126 F.2d 390, at p. 394, where we said:

"This suit is brought by the general officers of the united church, suing for themselves and other members of that church, and is brought against the duly elected representatives of the rival organization as representative of that organization. The state court suits were brought by members and officers of local units of the church against persons formerly associated with those units who were setting up rival claims to local properties. At the time those suits were instituted there had been no state or sectional organization of the persons seeking to appropriate the name of the Methodist Episcopal Church, South, but merely an attempt on the part of some persons in local congregations to withhold the local properties from the control of the united church. Since they were instituted, the dissident members have held a general meeting for the purpose of perpetuating the Methodist Episcopal Church, South, as an organization separate and distinct from the united church, and have formed an organization under the name of the South Carolina Conference of the Methodist Episcopal Church, South. The defendants here are sued as members and representatives of that organization. It is clear that no judgment entered in any of the state suits could settle the broad questions which plaintiffs seek to have settled in this suit in such way as to be binding either upon the united church as a whole or upon the rival organization represented by defendants. Cf. Watson v.

Jones, 13 Wall. 679, 715, 717, 20 L.Ed. 666."

Defendants contend, however, that although the decision of the state court is not binding on the principle of res adjudicata, it must be followed by this court as the law of South Carolina, under the decision of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487. Even if we were of opinion that the decision in the state court established a rule of law for South Carolina at variance with the rule of unfair competition stated above, which we think is recognized as the law by practically all courts in this country and England, it would not follow that plaintiffs would not be entitled to an injunction, but merely that the injunction should be so drawn as not to apply to activities of defendants limited to the State of South Carolina. Adam Hat Stores v. Lefco, 3 Cir., 134 F.2d 101; Zephyr American Corp. v. Bates Mfg. Co., 3 Cir., 128 F.2d 380, 386; R.C.A. Mfg. Co. v. Whiteman, 2 Cir., 114 F.2d 86, 89; note 148 A.L.R. 139 et seq.; Chaffee, Unfair Competition, 53 Harvard Law Review 1289, 1300. It would be intolerable that, in a suit between the representatives of a church, having a membership in many states, and dissident members who have set up a rival organization also extending into many states, the determination of a controversy affecting the church in all of the states where the rival organization is operating should depend upon the rule prevailing in one of the states, simply because a suit with relation thereto happened to be tried there. And this would be particularly unfortunate if the rule prevailing in such state was at variance with the rule prevailing in the others. Unfair competition is a tort governed by the law of the state where it occurs. If it occurs in a number of states it must be dealt with in accordance with their laws; and injunction against conduct constituting unfair competition in a number of states may not be denied merely because under the law of another state it is not recognized as unfair. If we were of opinion, therefore, that the decision of the state court had established for South Carolina a rule as to unfair competition at variance with the rule recognized elsewhere, injunction would not be denied but would be limited so as not to apply to conduct confined to the State of South Carolina. In such case, defendants would be enjoined from using the name Methodist Episcopal Church, South, in connection with any organization operating beyond the limits of South Carolina and from cooperating with others in the use of the name beyond the limits of that state, or, what is the same thing, they would be forbidden to use the name except within the State of South Carolina and in connection with activities confined to that state.

We do not think, however, that the South Carolina court has laid down any rule of law different from the general rule applicable in cases of unfair competition. The general rule against the unfair use of names, as pointed out above, is recognized by the South Carolina decisions (Planters' Fertilizer & Phosphate Co. v. Planters' Fertilizer Co., 135 S.C. 282, 133 S.E. 706); and there is nothing in the decision in the case of Turbeville v. Morris, supra, which shows any intention to change the rule or to deny its application to religious organizations. On the contrary, it clearly appears that the decision of the state court was based upon its findings of fact as to the abandonment of the name and as to no confusion resulting from the use thereof; and there is nothing in Erie R. Co. v. Tompkins which requires that we follow state courts in their findings of fact.

Where the principle of res adjudicata does not apply, we are not bound by the findings of fact made by a state court, even if the evidence is the same. This is so elementary as to require no citation of authority for its support. And we do not think that, upon the record before us, there is any ground for finding that there was any abandonment of the name Methodist Episcopal Church, South. Abandonment involves, not merely nonuser, but intentional relinquishment of rights; and there is no evidence of such intentional relinquishment. The evidence is all to the contrary. The names of the merger churches are carried in the book of discipline of the united church as identifying the bodies that have been united, and the resolution adopted by the uniting conference certainly negatives any intention to abandon the name. The conclusion that the adoption of this resolution was ultra vires the power of the conference involves, of course, a conclusion of fact; and our conclusion is that it was well within the implied power of the conference which was charged with the duty of unit-

ing the three organizations and providing a unified operation of the properties controlled by them. If, however, the uniting conference had no power to adopt such resolution, it does not follow that there was any intention on the part of the uniting churches or of the unified church to abandon the names under which they had been operating for use by others. They knew perfectly well that any seceding members could make use of the names of the uniting churches to attract to themselves members of the old organizations opposed to change; and it is hardly conceivable that they would have intended to abandon the names for such use to be made of them. Of course, the finding of the South Carolina court that the use of the name of the old organization will not lead to confusion is a pure finding of fact; and for reasons heretofore stated we have no doubt that our conclusion that it will lead to confusion is correct.

It is argued that Turbeville v. Morris, supra, should be construed as holding as a matter of law that, upon the merger of corporate bodies under a new name there is such an abandonment of an old name that unfair competition cannot be predicated of its use; but we do not think such construction can properly be placed upon that decision. Such a rule would be so repugnant to reason, so far divergent from the principles underlying the law of unfair competition as declared in prior decisions of the South Carolina court, and so much opposed to the rule prevailing in other jurisdictions, that we ought not impute to the Supreme Court of South Carolina an intention to adopt it unless no other interpretation of the decision of the court is possible. The court certainly did not say in express words that it was adopting any such rule; and when it referred to the concurrent "finding of fact" of the lower court and the referee that the United Church had "abandoned" the name, and to their concurrent finding that the attempt of the uniting conference to hold on to the name was beyond its power, the only conclusion is that the court was basing its decision upon these findings of fact. And this is certainly true of its finding that the use of the name would not lead to confusion.

▇▇▇▇ It is clear, however, that even if Turbeville v. Morris, supra, were construed to hold that upon a merger such as occurred here there is abandonment as

matter of law of the names of the merged bodies, the position of defendants is not helped; for, as shown above, the right to injunction does not depend upon the right to the use of the name but upon the right to be protected against its unfair use by others. It is true that the state court refused injunction because of such abandonment; but whether injunction will be granted or not is not a matter as to which we look to state law for guidance. We look to state law to determine what the rights of the parties are; but we look to the federal practice to determine the remedies available in the federal courts for their protection in a federal suit in equity. Russell v. Todd, 309 U.S. 280, 287, 60 S.Ct. 527, 84 L.Ed. 754; Sprague v. Ticonic Nat. Bank, 307 U.S. 161, 164, 59 S.Ct. 777, 83 L.Ed. 1184; Matthews v. Rodgers, 284 U.S. 521, 529, 52 S.Ct. 217, 76 L.Ed. 447; Henrietta Mills v. Rutherford County, 281 U.S. 121, 128, 50 S.Ct. 270, 74 L.Ed. 737; Crosley Corp! v. Hazelton Corp., 3 Cir., 122 F.2d 925, 927; Black & Yates v. Mahogany Ass'n, 3 Cir., 129 F.2d 227, 233. The rule is well stated by Judge Biggs in the case last cited as follows:

"As to substantive rights the cases are clear that the rules of substantive law to be applied in a federal equity court in a diversity case are those which would be applied in a state court sitting in the same state. This is a logical and indeed necessary extension of the principle of Erie R. Co. v. Tompkins, supra. See Ruhlin v. New York Life Ins. Co., 304 U.S. 202, 205, 58 S.Ct. 860, 82 L.Ed. 1290; New York Life Ins. Co. v. Jackson, 304 U.S. 261, 58 S.Ct. 871, 82 L.Ed. 1329, and Rosenthal v. New York Life Ins. Co., 304 U.S. 263, 58 S.Ct. 874, 82 L.Ed. 1330. Nothing contained in Russell v. Todd, 309 U.S. 280, 60 S.Ct. 527, 84 L.Ed. 754, or in West v. American Telephone & Telegraph Co., 311 U.S. 223, 61 S.Ct. 179, 85 L.Ed. 139, 132 A.L.R. 956, indicates the contrary.

\*     \*     \*     \*     \*     \*

"In Sprague v. Ticonic [Nat.] Bank, 307 U.S. 161, 164, 165, 59 S.Ct. 777, 779, 83 L.Ed. 1184, the Supreme Court by Mr. Justice Frankfurter, held, following earlier decisions, including Payne v. Hook, 7 Wall. 425, 430, 19 L.Ed. 260, that 'The suits "in equity" of which these courts [of federal equity jurisdiction] were given "cognizance" ever since the First Judiciary Act 1 Stat. 73, constituted that body of rem-

edies, procedures and practices which theretofore had been evolved in the English Court of Chancery, subject, of course, to modifications by Congress, e. g., Michaelson v. United States, 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162, 35 A.L.R. 451.' We think that this must be deemed to be an indication from the Supreme Court that in so far as equitable remedies are concerned federal courts are to grant them in accordance with their own rules which have been developed out of the English Chancery practice. The words of Mr. Justice Frankfurter in the Ticonic Bank case are a plain indication that the rule enunciated in Payne v. Hook, supra, 7 Wall. page 430, 19 L.Ed. 260, 'The equity jurisdiction conferred on the Federal Courts is the same that the High Court of Chancery in England possesses; is subject to neither limitation or restraint by State legislation, and is uniform throughout the different States of the Union', is the law so far at least as the granting of equitable remedies is concerned. The rule of Erie R. Co. v. Tompkins being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law."

▉ There is no question but that, under the law of South Carolina, the united church upon the merger of the uniting churches became vested with all the rights and property of the Methodist Episcopal Church, South; and there is no question, furthermore, but that a federal court of equity has the power to protect and should protect such rights and property by injunction against those who seek to encroach upon them by unfair practices such as are here involved. To apply the language of Judge Biggs above quoted, "the rule of Erie R. Co. v. Tompkins being determinative of substantive rights, there is still preserved to the federal courts a uniform basis for granting equitable remedies in cases in which substantive rights have arisen under state law."

The case comes to this: A great Christian denomination seeking that unity for which all Christians have been striving in recent years, has brought about a union of the three branches into which those who have held its faith have been divided. In achieving this union it has merged the organizations of the three branches under a name composed of elements common to the names of all. Certain members of one of the branches, who are not willing to go into the merger with the organization of which they have been members, are seeking to use its old name for that of a new and rival organization to operate in the same territory. Such use of the name will enable the new organization to strengthen itself at the expense of the old, will inevitably result in much confusion and will cause injury and damage to the old organization. We have no doubt that such a case is one calling for injunctive relief. The dissident members who are unwilling to go along with the merger unquestionably have the right to withdraw from the church and form a new organization, calling it by any name that will not lead to confusion or enable it to appropriate the standing and good will of the organization that has been merged; but they have no right to use the name of the organization from which they have withdrawn and thus hold themselves out to the community as a continuation of or as connected with that organization.

For the reasons stated, so much of the decree appealed from as refuses an injunction will be reversed and the cause will be remanded with direction to grant the injunction prayed.

Reversed.