HOPE LUTHERAN CHURCH, St. Matthew Lutheran Church, Cross and Crown Lutheran Church, Faith Lutheran Church, St. Mark Lutheran Church (A.L.C.), King of Glory Lutheran Church, Ascension Lutheran Church, Calvary Lutheran Church, Concordia Lutheran Church, Emmaus Lutheran Church, Messiah Lutheran Church, Our Saviour Lutheran Church, Our Shephard Lutheran Church, Peace Lutheran Church, St. John Evangelical Lutheran Church, St. Paul's Evangelical Lutheran Church, St. Peter Evangelical Lutheran Church, Trinity Lutheran Church, Zion Lutheran Church, and Carmel Lutheran Church, Defendants-Appellants,

v.

Edward M. CHELLEW, Marion S. Chellew, Harold E. Sawyer, Alice E. Sawyer, John H. Waldo, Ruth Kent, Robert W. Kellum, Elizabeth P. Kellum, Carleton B. Edwards, Olive M. Edwards and Esther R. Chapman, Plaintiffs-Appellees.

No. 1–1082 A 320.

Court of Appeals of Indiana, First District.

March 29, 1984.

Rehearing Denied May 16, 1984.

Michael R. Fruehwald, Barnes & Thornburg, Indianapolis, for defendants-appellants.

William S. Ellis, Ellis, Stringfellow, Patton & Leibovitz, New York City, for amici curiae.

Ralph Ogden, M. Anne Wilcox, Wilcox, Ogden & DuMond, Indianapolis, Peter L. Obremskey, Parr, Richey, Obremskey & Morton, Lebanon, for plaintiffs-appellees.

RATLIFF, Judge.

## STATEMENT OF THE CASE

In a class action [1] brought by the named plaintiff, Edward M. Chellew, and 65 other individuals against Hope Lutheran Church and 18 other Lutheran Churches,[2] a Boone Superior Court jury awarded the plaintiffs $319,471.45 in damages. The churches now appeal.

We reverse.

## FACTS

In 1972, Harold Ott, a retired Lutheran minister, approached the Federation of Lutheran Churches of Indianapolis [3] with a proposal that a retirement home for elderly Lutherans be established in the Indianapolis area. Interested in Ott's proposal, the Federation appointed an *ad hoc* committee to give it consideration. At Ott's request, the Federation also granted the committee a $10,000 loan to enable it to obtain an option on a parcel of real estate where the retirement home could be established.

Following the committee's initial meeting in July of 1973, the newly formed subcommittee for legal matters drafted proposed bylaws and articles of incorporation for the creation of a not-for-profit corporation which would operate the retirement home.

---

1. The plaintiffs brought this action pursuant to Indiana Rules of Procedure, Trial Rule 23(A) and (B)(3).

2. St. Peter Evangelical Lutheran Church was a defendant in this cause; however, due to clerical error it was not included on the jury's verdict forms and the plaintiffs' claims against it were dismissed with prejudice.

3. As Ott explained at trial the Federation consisted of several Lutheran Churches belonging to the Lutheran Church-Missouri Synod. Its purpose was to provide chaplain services at an Indianapolis hospital and perform other charitable functions. Not all of the defendants in this case were members of the Federation.

The name selected by the committee for the corporation was "Central Indiana Lutheran Retirement Home, Incorporated". Explaining the choice of the name, Ott stated it was meant to convey that "membership was to be restricted to Lutheran congregations across [central Indiana]." Record at 794.

Among other things, the articles of incorporation established a fifteen member board of directors to be composed of nine lay persons and six ministers from the member congregations. Of the fifteen directors, five were to be from churches belonging to each of the three national Lutheran bodies.[4] The articles also limited membership to Lutheran congregations in central Indiana. Of particular interest in the instant case was the language in the articles of incorporation which declared:

"This Corporation shall be a *joint agency* of the participating congregations of The American Lutheran Church, The Lutheran Church in America, and The Lutheran Church-Missouri Synod and the purposes for which it is formed are purely religious, charitable and educational, for the providing of assistance, aid, care and treatment for the moral, social, mental and physical betterment of elderly persons ...."

Record at 768 (emphasis supplied).

In the spring of 1974, Central approved membership application forms and sent these along with the proposed bylaws and articles of incorporation to all Lutheran Churches in central Indiana. The membership applications provided, *inter alia:*

"The undersigned, [member congregation] having been duly authorized in accordance with its Constitution and By-Laws requirements, so to do, does hereby apply for membership in the proposed Central Indiana Lutheran Retirement Home, Inc., a corporation proposed to be formed under the Indiana Not-For-Profit Corporation Act of 1971.

[T]he undersigned does so with the strict limitation and understanding, that,

. . . .

(b) membership in the proposed corporation will in no way or manner financially obligate the undersigned[.]"

Record at 2034. In addition to sending these materials, Ott and other committee members visited the congregations to explain the corporation's purpose and encourage participation. By September of 1974, 23 churches had applied for membership.

On November 3, 1974, delegates from the member congregations attended an organizational meeting at which time they approved the articles of incorporation and bylaws and elected Central's initial board of directors. Following this meeting the articles of incorporation were filed with the Indiana Secretary of State on December 19, 1974.

Pursuant to Central's articles of incorporation it was governed by its board of directors. Accordingly, these directors elected officers and authorized various corporate transactions. The delegates from member congregations did, however, meet on a yearly basis to elect new directors, vote on amendments to the articles of incorporation and bylaws, and receive reports on Central's activities.

In 1975 plans for the retirement home began to materialize as Central's board of directors solicited presentations from various developers for the construction of the facility. By December of that year Central's board contracted with John Gard Corporation as developer of the project. Gard proceeded to conduct a feasibility study and proposed a financing scheme which Central's board approved. At Gard's suggestion, Central adopted a formal name for the project: "Carmel Creek Manor, the Lutheran Retirement Home". Record at 865. At trial, Ott explained: "we [Central's

---

**4.** These were the Lutheran Church-Missouri Synod (LCMS), American Lutheran Church (ALC), and the Lutheran Church in America (LCA). In May of 1978 Central's articles were amended to expand the board to 20 members. Five of these were to be from member congregations belonging to the newly formed Association of Evangelical Lutheran Churches (AELC).

board][5] wanted to emphasize the fact it was a Lutheran home. We wanted to emphasize that factor." Record at 864.

By July of 1977,[6] Central's board of directors approved the contracts to be used in selling life memberships to prospective residents of the retirement home. Central, however, did not sell the memberships directly, but instead, contracted with John Gard to employ salesmen for this purpose. While the salesmen were under Gard's supervision, Central paid their commissions directly. In all, Central sold 64 individual or joint memberships to 89 different individuals.[7] However, prior to August of 1978, nine of these memberships were cancelled and the fifteen individuals involved received refunds of their down payments.

Prospects for the home dimmed in 1978, however. A necessary zoning change for the property upon which Central was to build the home was denied and essential financing for the project failed to materialize. Also, as a result of these and other difficulties, the contract with Gard was terminated. By this time much of the money received in the form of down payments from prospective life members had been depleted by development costs. Despite efforts by Central to revive the project, by May of 1978, bankruptcy was declared.

Shortly thereafter, the plaintiffs initiated this action for the return of their down payments.

Additional facts are stated in our discussion of the issues.

## ISSUES

The issue requiring our review is:

Did the churches' participation in the creation and operation of Central give rise to an actual or apparent agency or agency by estoppel relationship between the parties?

## DISCUSSION AND DECISION

■ Fundamentally, resolution of the instant case turns on whether there was sufficient evidence of either an actual or apparent agency or an agency by estoppel relationship between the churches and Central. Obviously, if sufficient evidence of any of these theories is present, the jury's verdict must be sustained. *English Coal Co., Inc. v. Durcholz,* (1981) Ind.App., 422 N.E.2d 302, 311, *trans. denied.* However, notwithstanding our limited standard of review which prohibits us from reweighing the evidence or judging the credibility of witnesses, *James v. Brink & Erb, Inc.,* (1983) Ind.App., 452 N.E.2d 414, 416; *Travis v. Hall,* (1982) Ind.App., 431 N.E.2d 519, 520; *Roberts v. Wabash Life Insurance Co.,* (1980) Ind.App., 410 N.E.2d 1377, 1382, *trans. denied* (1981), we agree with the churches that there was insufficient evidence to support any of the three theories.

■ As this court has defined actual agency, it is a relationship resulting from the manifestation of consent by one party to another that the latter will act as an agent for the former. Additionally, the agent must acquiesce to the arrangement and be subject to the principal's control. *Lafayette Bank & Trust Co. v. Price,* (1982) Ind.App., 440 N.E.2d 759, 761; *Lewis v. Davis,* (1980) Ind.App., 410 N.E.2d 1363, 1366; *Mooney-Mueller-Ward, Inc. v. Woods,* (1978) 175 Ind.App. 302, 307, 371 N.E.2d 400, 403. In short, the elements of an actual agency relationship are three: manifestation of consent by the principal; acquiescence by the agent; and control exerted by the principal.

5. When Ott used the word "we", the record reveals it was in response to the following question: "Did you *and members of the Board* discuss the significance or importance of the name of the retirement project before you selected [Carmel] Creek Manor Lutheran Retirement Home?" Record at 864 (emphasis supplied).

6. Other activities in 1977 included obtaining a Certificate of Need under the Social Security Act

from the Indiana State Board of Health, solicitation of loans for the development, and acquisition of an option on a parcel of real estate. All of these activities were conducted by members of Central's board of directors.

7. Ironically, the majority of the purchasers were not Lutheran.

Illustrative of this definition is the case of *Mooney-Mueller-Ward, Inc.* Therein, the lessee of a drugstore agreed to keep the inventory at a stated level by making only cash purchases. The lessor, however, maintained ownership of the inventory at all times. Notwithstanding this agreement, the lessee made several credit purchases, defaulted, and then declared bankruptcy. The supplier then brought an action against the lessor alleging the existence of an agency relationship between the lessor and lessee. Affirming a judgment for the lessor, we held that while the facts may have revealed an agreement the lessee would act on behalf of the lessor, there was no evidence indicative of the lessor exerting control over the lessee's operations. To the contrary, we found the lessee

> "controlled every facet of the drugstore operation. He hired employees and set their wages and hours. He purchased supplies, paid the rent, compiled tax data, and kept his own books and records. The Dannachers had absolutely no control over the operation of the Medical Arts Pharmacy, including the buying and selling of inventory. The Woods' only obligation to the Donnachers [sic] with regard to the inventory was to maintain such inventory and return it to the Donnachers [sic] at the expiration of the lease in such amount and condition that its value would be the same as when the lease was signed."

*Id.* at 307, 371 N.E.2d at 403–04. Thus, without a showing the lessor exerted control over the lessee, there was insufficient evidence of an actual agency relationship between the parties.

■ Like an actual agency relationship, an apparent agency is also initiated by a manifestation of the principal. However, the required manifestation is one made by the principal to a third party who in turn is instilled with a reasonable belief that another individual is an agent of the principal. *Stuteville v. Downing,* (1979) 181 Ind.App. 197, 199, 391 N.E.2d 629, 631. The essential element being there must be some form of communication, direct or indirect, by the principal, which instills a reasonable belief

in the mind of the third party. *Id.; Burger Man, Inc. v. Jordan Paper Products, Inc.,* (1976) 170 Ind.App. 295, 312, 352 N.E.2d 821, 832, *trans. denied* (1977); *Storm v. Marsischke,* (1973) 159 Ind.App. 136, 138, 304 N.E.2d 840, 842. Manifestation or statements made by the agent are not sufficient to create an apparent agency relationship. *Storm,* 159 Ind.App. at 139, 304 N.E.2d at 843.

In the instant case, the plaintiffs contend there is sufficient evidence of both an actual and apparent agency relationship between the churches and Central. As evidence of an actual agency relationship they cite the provision in Central's articles of incorporation which states: "This Corporation shall be the *joint agency* of the participating congregations of The American Lutheran Church, The Lutheran Church in America, and The Lutheran Church-Missouri Synod ..." Record at 835 (emphasis supplied). According to the plaintiffs, this language is a clear expression of the churches manifestation to Central that it should serve as its agent and of Central's acquiescence to so act. Further, the plaintiffs submit, control by the churches is evidenced by the fact their congregations sent delegates to Central's annual meetings and that several of the churches had ministers or lay members serving on Central's board of directors.

■ The plaintiffs are correct in their contention that the churches were involved in the creation of Central. It was the member churches whose delegates approved Central's articles of incorporation and bylaws and chose the initial board of directors. However, once incorporated, Central became a distinct and autonomous entity, one controlled by its board of directors and clearly distinguishable from the churches. The fact that the term "joint agency" appears in Central's incorporation documents in no way alters this conclusion. The plaintiffs misconstrue this term to mean the churches established an actual agency relationship with Central. In context, however, this language merely indi-

cates that the churches, in a joint effort, created Central, an agency in and of itself, to establish and operate a retirement home. This interpretation is supported by the uncontradicted testimony of attorney John Tagge, who as drafter of the incorporation documents responded to a question regarding the term by stating: "references to the word 'agency' were intended to apply to the charitable or retirement home as an agency itself." Record at 2134. In short, Central alone was the agency. We therefore fail to agree that the term "joint agency" represented a manifestation by the churches and acquiescence by Central to the creation of a principal-agent relationship.

■ Nor do we believe Central was in any manner controlled by the churches. The mere participation of congregational delegates in the formation of Central was not tantamount to control. Rather, as the record indicates, Central, like any other corporation, was controlled by its board of directors. True, the delegates attended annual meetings and received progress reports on Central's activities, but it was Central's board of directors that conducted those activities. For example, it was Central's board of directors that solicited presentations from potential developers and ultimately contracted with John Gard Corporation for the development of the retirement home. It was also the board of directors that approved Gard's financing scheme and adopted the name "Carmel Creek Manor, the Lutheran Retirement Home". Furthermore, it was the board of directors that approved the life membership application forms, authorized Gard to solicit applications, and then voted on prospective members. Finally, it was the board of directors, not the churches, that made the decision to declare Central bankrupt. Because none of these acts were committed by the churches, we thus find, as in *Mooney-Mueller-Ward, Inc.,* the absence of control by the purported principals negates the existence of an actual agency relationship.

Having found insufficient evidence of an actual agency relationship, we must next determine whether the evidence establishes the existence of an apparent agency, or as the plaintiffs now contend, an agency by estoppel. The churches argue such a finding is impossible because they neither made manifestations to the plaintiffs that Central was their agent nor exercised any control over its operations. Consequently, the churches submit, the plaintiffs were given no reason to believe an agency relationship existed.

Countering this argument, the plaintiffs posit that by permitting Central to use the word "Lutheran" in the name of the retirement home as well as in its promotional literature, the churches led life membership purchasers to believe the home had the support and financial backing of the Lutheran Church in general and the participating congregations in particular. To support this argument the plaintiffs liken the instant case to those applying trade name law, relying principally upon *Purcell v. Summers,* (4th Cir.1944) 145 F.2d 979. In that case, the United Methodist Church, the result of a merger of the Methodist Episcopal Church, South, the Methodist Episcopal Church, and the Methodist Protestant Church, sought to enjoin a dissident group from using the name Methodist Episcopal Church, South on grounds its use constituted unfair competition. Holding the name chosen by the dissident group was intended to mislead the public and capitalize on the good will of the former organization, the court made the following observations upon granting the injunction.

"Upon these facts, we do not think that there can be any doubt as to the right of plaintiffs to the injunction prayed. The use by one organization of the name of another for the purpose of appropriating the standing and good will which the other has built up is a well recognized form of the wrong known to the law as unfair competition, against which courts of equity have not hesitat-

ed, in any jurisdiction, to use the full power of the injunctive process.

*Id.* at 984.

[Moreover,] the fact that the name of the old organization is not presently being used makes no more difference in the case of a religious or charitable organization than it does in the case of a business organization. In any case the ground of relief is the element of 'passing off' or implied misrepresentation which enables the one using the name to appropriate to itself the standing and good will which rightfully belong to another."

*Id.* at 986. Finally, the court concluded by rejecting the group's argument that its name was permissible because the words "Methodist" and "Episcopal" were merely used in a generic sense and did not implicate the other churches.

"It is said that the words 'Methodist' and 'Episcopal' are generic terms and that defendants have the right to use them for that reason, but defendants are not proposing to use either of these words in a new name so different from the old that no confusion could result. They are using the precise name of the old church; and the question is, not whether they have the right to use 'Methodist' or 'Episcopal' in a new name so constructed as to avoid confusion, but whether they have the right to use the old name in a way that amounts, as we think it does, to implied misrepresentation to the damage of plaintiffs."

*Id.* at 988.

In the present case, the plaintiffs argue that by permitting the use of the word "Lutheran", the churches effectively made a manifestation to the plaintiffs that Central's operations were supported by the Lutheran Church and that Central was an agent of the churches. The plaintiffs submit, moreover, that this conduct was mere-

ly an attempt by the churches to capitalize on the associational value of the word "Lutheran" to instill confidence in the minds of prospective life members. Thus, the plaintiffs assert, the churches created an apparent agency and are liable as principals for Central's actions.

Alternatively, the plaintiffs contend that even if the churches' conduct was not a sufficient manifestation to create an apparent agency, it was enough to give rise to an agency by estoppel. According to the plaintiffs, when the churches permitted the use of the word "Lutheran", they intended, and in fact did, induce the plaintiffs to rely upon the Lutheran Church and the participating congregations in purchasing their life memberships. Hence, the plaintiffs reason, the churches' conduct at the very least created an agency by estoppel.

■ As interesting as the plaintiffs' arguments may be, we cannot find an agency relationship of either variety existed. Addressing first the issue of apparent agency, we find the plaintiffs' application of trade name law to the instant case unpersuasive. Like the other cases relied upon by the plaintiffs, *Purcell* is readily distinguishable. Not only was the action one between competitors instead of customers of an independent corporation, but more importantly, it was prompted by the defendant's use of a name *identical* to that of one of the former churches. Thus, the court in *Purcell* was correct in finding the defendants had not used the terms "Methodist" and "Episcopal" in a generic sense, but had in fact appropriated the actual name and goodwill of one of the former churches. Here, however, the word "Lutheran" was clearly used in a generic sense.[8] Had the churches wished to convey to the plaintiffs that their *individual congregations* were affiliated with Central in some capacity, they could have inserted their individual

8. As the plaintiffs concede, the word "Lutheran" has a broad meaning: "It refers to a Protestant religious denomination which takes its name from Martin Luther, whose teachings form the basis of its theological principles and which has ... a common core of beliefs." Appellees' brief at 64. From our reading of the briefs and

record we also gather that the Lutheran Church is divided into several synodical groups, *see* note 4 *supra,* which are composed of individual congregations. We thus conclude the word "Lutheran", without more, does not identify a particular synod or congregation, but rather, refers in a broad sense to a Protestant denomination.

congregational names instead. However, only the word "Lutheran" was utilized, obviously in an attempt to convey an affiliation with the Lutheran Church in the broadest sense and not a particular congregation. We thus fail to see how the name of the retirement home in any way implied the individual defendant—churches were principals of Central in an apparent agency relationship.

Moreover, use of the word "Lutheran" in the name of the retirement home did not exhibit the degree of control by the churches necessary to create an apparent agency. While delegates from the churches may have been involved in the formation of Central, it was ultimately the decision and responsibility of Central and its board of directors to use the word "Lutheran" in the name of the home. The same is true of the promotional materials used by Central in marketing the retirement home. These materials were approved by Central and distributed by its agents, the salesmen hired by John Gard Corporation.

Therefore, not only was the evidence insufficient to establish a manifestation by the churches to the plaintiffs, it was devoid of proof that Central's operations were controlled by the churches. Consequently, the jury's verdict may not be sustained on the theory of apparent agency.

Finally, we find some of the same deficiencies previously discussed also make the plaintiffs' argument regarding agency by estoppel meritless. We recently stated the elements of this theory in these terms:

"The doctrine involved in these cases, equitable estoppel or estoppel *in pais,* requires proof of several elements. Party A must have made false representations or concealed material facts while having knowledge of the true state of facts or the ability to obtain that knowledge. The representations must have been made to party B, with the intent to induce B's reliance on those statements. Finally, B must have changed his position in reliance upon A's statements. *Justice et al. v. Mid-State Homes* (1970), 146 Ind.App. 662, 257 N.E.2d 843; *Schill v. Choate* (1969), 144 Ind.App. 543, 247 N.E.2d 688; *ITT Cannon Elec., Inc. v. Brady* (1967), 141 Ind.App. 506, 230 N.E.2d 114."

*Kokomo Veterans, Inc. v. Schick,* (1982) Ind.App., 439 N.E.2d 639, 643, *trans. denied* (1983).

█ Applying these principles to the present case, the plaintiffs argue the churches made false representations or concealed material facts when they permitted the word "Lutheran" to be used in the name of the home without disclosing the fact that the individual churches were not financially responsible for Central's operations. The plaintiffs contend they relied on these false representations,[9] changed their position by making down payments, and then were injured when Central declared bankruptcy.[10]

---

**9.** While testimony regarding these statements was admitted into evidence over the hearsay objections of the churches, it was admitted solely to establish the plaintiffs' state of mind and not as proof that false statements were actually made.

**10.** The plaintiffs also contend their position is supported by the Restatement's definition of agency by estoppel. It provides:

"A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if

(a) he intentionally or carelessly caused such belief; or

(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts."

Restatement (Second) of Agency § 8B (1958).

The plaintiffs state in their brief that this provision was adopted by this court in *Kokomo Veterans, Inc.* It was not. However, the elements contained in the Restatement—inducing reliance in third parties by intentional or careless representations and change in position by the third party—are very similar to those stated by this court in *Kokomo Veterans, Inc.* Thus, we believe our discussion of those elements within the context of *Kokomo Veterans, Inc.,* sufficiently addresses the plaintiffs' concerns.

What the plaintiffs fail to appreciate is that the choice of the home's name and manner in which life memberships were sold was the conduct of a corporate entity wholly distinct and separate from the individual defendant-churches. If false representations were made, they were the product of Central's conduct and not that of the churches. Contrary to the plaintiffs' urgings, the record herein is devoid of any evidence of the churches ever engaged in the complained of conduct. It follows, therefore, that responsibility for the conduct rests with Central and its board of directors.[11] Put simply, the facts herein do not support a finding of an agency by estoppel.

Because the evidence was insufficient to support a finding of agency on any theory, we reverse.

Reversed.

ROBERTSON, J., concurs.

NEAL, P.J., concurs with opinion.

NEAL, Presiding Judge, concurring.

I concur in the majority opinion for the reasons stated therein, and the result reached. In addition I desire to add the following. The plaintiff's argument, in essence, is that because the defendant and their members, as well as other interested persons, caused Central to be created and incorporated, and supported its purpose, they became indemnitors to the corporate debt. The very purpose for which a corporation is created is to create a vehicle with which the organizers and backers can conduct some business enterprise they are interested in, financially or otherwise, with limited liability to themselves. All corporations have such interested persons and backers who participate financially, and as officers and directors. Corporate law envisions such participation. In many fields of endeavor a single interest group may compartment the areas of activity into separate corporate entities, all controlled by a single holding company or by individuals. Such does not result in residual liability to the organizers, officers, directors and supporters so long as the corporate entity is respected. Any contrary holding would render corporate endeavors in the world a shambles, and the corporate concept would become of no purpose. The evidence in this case shows merely interest, participation and support. There is no agency, nor control.

---

11. We note the plaintiffs did attempt to pierce the corporate veil and hold the directors of Central liable. However, the trial court granted the churches' motion for a directed verdict as to this issue, a ruling which the plaintiffs do not appeal.